**WALSH & ASSOCIATES, APC**
16633 Ventura Boulevard, Suite 800
Encino, CA 91436
Telephone: (818) 986-1776
Facsimile: (818) 382-2071
DENNIS J. WALSH, Esq. (SBN 106646)
Email: dwalsh@walshlawyers.com
ARASH ARJANG, Esq. (SBN 276237)
Email: aarjang@walshlawyers.com

Attorneys for Defendants, JURUPA UNIFIED
SCHOOL DISTRICT, TRENTON HANSEN, and
DANIEL BROOKS

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSICA TAPIA, an individual,<br><br>Plaintiff,<br><br>v.<br><br>JURUPA UNIFIED SCHOOL DISTRICT; TRENTON HANSEN, both in his personal capacity and in his official capacity as the Jurupa Unified School District Superintendent; DANIEL BROOKS, both in his personal capacity and in his official capacity as Jurupa Unified School District Assistant Superintendent,<br><br>Defendants. | Case No.: 5:23-cv-00789-FMO-E<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES [FRCP 12(b)(6)]**<br><br>Date:  September 21, 2023<br>Time: 10:00 a.m.<br>Place: Courtroom 6D<br>         350 W. 1st Street<br>         Los Angeles, CA 90012<br><br>Hon. Fernando M. Olguin, United States District Judge<br><br>Magistrate Judge: Hon. Charles F. Eick<br><br>Action Date:May 3, 2023<br>Trial date:   Not Set |

MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 5:23-cv-00789-FMO-E - 1

**TO THE CLERK OF THE COURT, AND TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on September 21, 2023, at 10:00 a.m. or as soon thereafter as the matter may be heard in Courtroom 6D of the above-entitled court located at 350 W. First Street, Los Angeles, CA 90012, before the Honorable Fernando M. Olguin, Defendants JURUPA UNIFIED SCHOOL DISTRICT, TRENTON HANSEN, and DANIEL BROOKS, will and do hereby move the Court, pursuant to Fed. R. Civ. P. 12(b)(6) for dismissal of Plaintiff's Complaint, as follows:

(1)     The First, Second, Third, and Sixth Causes of Action pursuant to 42 U.S.C. § 1983 must be dismissed with prejudice against individual defendants TRENTON HANSEN and DANIEL BROOKS, who are being sued both in their official and personal capacity.  In their personal capacity, individual defendants TRENTON HANSEN and DANIEL BROOKS did not engage in a constitutional violation, and further, they are entitled to qualified immunity because Plaintiff has not alleged conduct by TRENTON HANSEN and DANIEL BROOKS which violated a clearly established statutory or constitutional right.  In their official capacity, individual defendants TRENTON HANSEN and DANIEL BROOKS are entitled to sovereign immunity under the Eleventh Amendment.

(2)     The First, Second, Third, and Sixth Causes of Action pursuant to 42 U.S.C. § 1983 must be dismissed with prejudice against JURUPA UNIFIED SCHOOL DISTRICT, because it is entitled to sovereign immunity under the Eleventh Amendment.

This Motion is based upon this Notice, the Memorandum of Points and Authorities, the pleadings and records in this Court's file, and upon such further matters as may be presented at or before the hearing on the Motion.

This Motion is made following a phone conversation with counsel for the Parties and exchanged e-mails, which occurred on July 19, 2023, July 20, 2023 and August 11,

2023, conducted pursuant to Local Rule 7-3 between Plaintiff's and Defendants' counsel, where the issues set forth herein were thoroughly discussed without resolution. At the conclusion of the August 11, 2023 exchange, the parties agreed this matter requires the assistance of the Court.

Dated: August 18, 2023

Respectfully Submitted,
WALSH & ASSOCIATES, APC

_____
Dennis J. Walsh, Esq.
Arash Arjang, Esq.
Attorneys for Defendants,
JURUPA UNIFIED SCHOOL
DISTRICT, TRENTON HANSEN,
and DANIEL BROOKS

1

## <u>TABLE OF CONTENTS</u>

2   **MEMORANDUM OF POINTS AND AUTHORITIES** ........................................ 1

3   **I.   INTRODUCTION AND FACTUAL ALLEGATIONS** .............................. 1

4       **A.   FACTUAL ALLEGATIONS IN THE COMPLAINT** ..................... 1

5           1.   Ms. Tapia's Employment with the District .................................. 1

6           2.   Ms. Tapia's Religious Beliefs.................................................... 1

7           3.   Events Leading to Ms. Tapia's Termination ............................... 2

8       **B.   SUMMARY OF RELEVANT STATE AND FEDERAL
9             LAWS/EXECUTIVE ORDERS IN PLACE AS RELATED TO
              TRANSGENDER STUDENTS**............................................................ 5

10  **II.  LEGAL STANDARD** ..................................................................................... 11

11      **A.   MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)**........... 11

12  **III. PLAINTIFF'S FIRST, SECOND, THIRD, AND SIXTH CAUSES OF
13        ACTION FOR VIOLATION OF CIVIL RIGHTS SHOULD BE
          DISMISSED FOR FAILURE TO STATE A CLAIM**............................. 13

14      **A.   DEFENDANTS TRENTON HANSON AND DANIEL
15            BROOKS ARE ENTITLED TO QUALIFIED IMMUNITY**........ 13

16      **B.   TRENTON HANSON AND DANIEL BROOKS AND JURUPA
              UNIFIED SCHOOL DISTRICT ARE ENTITLED TO
17            ELEVENTH AMENDMENT IMMUNITY** ...................................... 19

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

8, 2021, President Biden issued,
Executive Order 14021 ....................................................................... 10, 16

*Act Up!/Portland v. Bagley,*
988 F.2d 868 (9th Cir.1993) .................................................................. 18

*Ashcroft v. al-Kidd,*
563 U.S. 731 (2011)....................................................................... 14, 15

*B & P Development Corp. v. City of Saratoga,*
(1986) 185 Cal.App.3d 949 ................................................................... 13

*Balistreri v. Pacifica Police Dept.,*
901 F2d 696 (9th Cir. 1990) ................................................................. 12

*Bank of New York Mellon v. Citibank, N.A.,*
(2017) 8 Cal.App.5th 935 [214 Cal.Rptr.3d 504].................................. 13

*Barron v. Reich,*
13 F.3d 1370 (9th Cir. 1994) ................................................................ 12

*Belanger v. Madeira Unified Sch. Dist.,*
963 F.2d 248 (9th Cir. 1992) ................................................................ 19

*Caltex Plastics, Inc. v. Lockheed Martin Corporation,*
824 F.3d 1156 (9th Cir. 2016) .............................................................. 12

*Cerrato v. San Francisco Community College Dist.,*
26 F.3d 968 ........................................................................................... 14

*Doe v. Lawrence Livermore Nat. Laboratory,*
131 F.3d 836 (9th Cir. 1997) ................................................................ 20

*Downing v. West Haven Board of Ed.,*
162 F.Supp.2d 19, (2001) ..................................................................... 14

*Eaglesmith v. Ward,*
73 F.3d 857 (9th Cir. 1995) .................................................................. 19

*Ex Parte Young,*
209 U.S. 123 (1908).............................................................................. 20

*Goodisman,*
724 F.2d ................................................................................................ 20

*Graham v. Connor,*
490 U.S. 386 (1989).............................................................................. 19

*Gray v. Evercore Restructuring L.L.C.,*
544 F.3d 320 (1st Cir. 2008) ................................................................ 12

v

*Groh v. Ramirez,*
   540 U.S. 551 (2004)..................................................................................14

*Haley v. City of Boston,*
   657 F.3d 39 (1st Cir. 2011).....................................................................13

*Harlow v. Fitzgerald,*
   457 U.S. 800 (1982)......................................................................14, 15, 19

*Harper v. Poway Unified School District,*
   345 F.Supp. 1096 (S.D. Cal. 2004).........................................................14

*Harper, supra,*
   345 F.Supp. ..............................................................................................14

*Hensley Mfg. v. ProPride, Inc.,*
   579 F.3d 603 (6th Cir. 2009) ..................................................................12

*Hope v. Pelzer,*
   536 U.S. 730 (2002).................................................................................15

*Hunter v. Bryant,*
   502 U.S. 224, (1991)...........................................................................14, 15

*Idaho,*
   521 U.S. ...................................................................................................20

*Kalnoki v. First American Trustee Servicing Solutions, LLC,*
   (2017) 8 Cal.App.5th 23 [214 Cal.Rptr.3d 292]....................................13

*Khoja v. Orexigen Therapeutics, Inc.,*
   899 F.3d 988 (9th Cir. 2018) ..................................................................12

*Lee v. City of Los Angeles,*
   250 F.3d 668 (9th Cir. 2001) ..................................................................12

*Lytle v. Wondrash,*
   182 F.3d 1083, (9th Cir. 1999) ...............................................................14

*Malley v. Briggs,*
   475 U.S. 335 (1986).................................................................................14

*Mansourian v. Board of Regents of the University of California at Davis,*
   (E.D. Cal. 2010) 757 F.Supp.2d 1030 ...................................................15

*Martinez v. Cty. of Los Angeles,*
   47 Cal. App. 4th 334 (1996)....................................................................15

*Mitchell v. Los Angeles Community College District,*
   861 F.2d 198 (9th Cir. 1988) .............................................................19, 20

*Nishimatsu Const. Co., Ltd. v. Houston Nat'l Bank,*
   515 F.2d 1200 (5th Cir. 1975) ................................................................13

*Owen v. City of Independence, Mo.,*
   (1980) 445 U.S. 622.................................................................................14

*Pearson v. Callahan,*
   555 U.S. 223 (2009).................................................................................14

vi

*Price v. Akaka,*
  928 F.2d 824, (9th Cir. 1990) ...................................................................14

*Sato v. Orange County Dep't of Education,*
  861 F.3d 923 (9th Cir. 2017) ..............................................................19, 20

*Shroyer v. New Cingular Wireless Services, Inc.,*
  622 F.3d (9th Cir. 2010) .........................................................................12

*Sprewell v. Golden State Warriors,*
  266 F.3d. 979 (9th Cir. 2001) ................................................................13

*Starr v. Baca,*
  652 F.3d 1202 (9th Cir. 2011) ................................................................12

*Thompson v. Illinois Dept. of Prof. Reg.,*
  300 F.3d. 750 (7th Cir. 2002) ................................................................13

*U.S. v. Ritchie,*
  342 F.3d 903 (9th Cir. 2003) ..................................................................12

*Van Buskirk v. CNN,*
  284 F.3d 977 (9th Cir. 2002) ..................................................................12

*White v. Pauly,*
  137 S.Ct. 548 (2017)................................................................................15

*Will,*
  491 U.S. n.10 (1989)................................................................................20

Statutes

20 U.S.C. 1681 .............................................................................................10
42 U.S.C. § 1983.................................................................................2, 19, 20
California Constitution, Article I, § 1...........................................................7
California Constitution, Article I, § 28(a)(7)...............................................8
California Constitution, Article I, § 28(a)(7) and 28(f)(1) .........................16
California Constitution, Article I, § 28(f)(1) ...............................................8
California Education Code § 200 ...........................................................5, 15
California Education Code § 201(a) .............................................................5
California Education Code § 201(b)..............................................................5
California Education Code § 201(d)..............................................................6
California Education Code § 201(e) ..............................................................6
California Education Code § 201(f) ..............................................................6
California Education Code § 210.7 .........................................................6, 16
California Education Code § 221.5(a) ...........................................................6
California Education Code § 221.5(f) ...........................................................6
California Education Code § 233.5(a) ...........................................................7
California Education Code § 233.5(b) ...........................................................7
California Education Code § 234.1 ...............................................................7

vii

California Education Code § 35183(a)(1) ........................................................5
California Education Code §§ 201, 220, 210.7, 221.5(a), 233.5(a) ...........................16
Education Code 220.................................................................3, 6, 7
Education Code section 44932 (4)..............................................................4
Education Code § 220, (8) ................................................................3
Section 422.55 of the Penal Code..........................................................5, 6, 7

Rules

16 (9th Cir ..................................................................................14
Federal Rules of Civil Procedure, Rule 10(c)............................................13
FRCP 12(b)(6) ....................................................................passim

Other Authorities

AB 1266.....................................................................................8
Assembly Bill 1314 ............................................................10, 17

1

### MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.    INTRODUCTION AND FACTUAL ALLEGATIONS**

3

**A. FACTUAL ALLEGATIONS IN THE COMPLAINT**

4

1.  Ms. Tapia's Employment with the District

5

Plaintiff JESSICA TAPIA ("Ms. Tapia") challenges a number of directives

6 issued to her by her employer, JURUPA UNIFIED SCHOOL DISTRICT ("JUSD" or

7 "the District").  FAC, ¶1.  Ms. Tapia was issued a notice of unprofessional conduct and

8 presented her with a "Plan of Assistance and Directives", which purportedly required

9 her to lie to parents about their children's gender identity, refer to them by their

10 preferred pronouns, refrain from expressing her religious beliefs with students or on her

11 social media, and allow students to use the bathroom or locker room that matched their

12 preferred sex.   FAC, ¶¶ 3-5.  Ms. Tapia was unable to comply with the directives due

13 to her religious beliefs and requested accommodations, which JUSD purportedly

14 refused to provide and subsequently terminated her employment with the District.  FAC,

15 ¶ 6.  Since 2014, Ms. Tapia worked for JUSD in varying capacities as a teacher, and in

16 2016, after obtaining her teaching credentials, she accepted a full-time teaching

17 position.  FAC, ¶¶ 18-22.  From 2017 to 2021, Ms. Tapia taught P.E. at Mira Loma

18 Middle School, where her Principal noted that she excelled as a teacher. FAC, ¶¶ 23-

19 25.   In 2021, Ms. Tapia was transferred to Jurupa Valley High School and began

20 working as the sole female P.E. teacher, where she received positive evaluations.  FAC,

21 ¶¶ 26-28.

22

2.  Ms. Tapia's Religious Beliefs

23

As a Christian, Ms. Tapia believes that her religion holds that God created two

24 sexes: male and female.  FAC, ¶ 29.  As a result of her faith, she is precluded from

25 endorsing policies that cause her to reject her faith, such as facilitating a student's

26 gender transition or withholding information about it from the student's parents.  FAC,

27 ¶ 30.  Ms. Tapia believes that the relationship between parents and children was created

28

by God, and that requires parents to train up a child in the way he should go.  FAC, ¶ 31.  Ms. Tapia has not discussed her religious beliefs with students unless she is approached and asked questions about her faith, and she listens to worship music during P.E. classes, but keeps the sound at a minimum.  FAC, ¶¶ 32-33.  Ms. Tapia regularly posts quotes, Bible verses, and her religious beliefs on her personal social media pages, and does not identify herself as a teacher or an employee of the District, nor that they are representative of the District's.  FAC, ¶ 34.

### 3. Events Leading to Ms. Tapia's Termination

Near the end of the 2021-2022 school year, Ms. Tapia received disturbing messages and comments on her Instagram account from Jurupa Valley High School students, and the next day, she was pulled out of classroom and was told that she needed to meet with Defendant Daniel Brooks ("Mr. Brooks"), Assistant Superintendent of Human Resources. FAC, ¶¶ 35-36.  Mr. Brooks informed Ms. Tapia that issues had been brought to the District's attention regarding her social media posts, and that she was being placed on paid administrative leave.  FAC, ¶ 37.

On July 29, 2022, Mr. Brooks, as authorized by Superintendent Trenton Hansen ("Mr. Hansen") sent Ms. Tapia unfounded allegations that the District was in receipt of and asked her to respond to them as part of an internal investigation.  FAC, ¶ 38.  The allegations were that the social media posts were racist, offensive, disrespectful, and mocking toward individuals based on their sexual orientation.  FAC, ¶¶ 39-40.  The allegations were a mischaracterization of who Ms. Tapia is, where her faith requires her to love all people, regardless of sexual orientation.  FAC, ¶¶ 41-43.  JUSD also accused her of proselytizing during P.E. classes, and not calling a student by the student's preferred pronoun.  FAC, ¶¶ 44-47.  After disputing the accusations through her union representative, on or about September 30, 2022, Ms. Tapia attended a meeting with her union representative where she received a Notice of Unprofessional Conduct from Mr. Brooks, which was authorized by Mr. Hansen.  FAC, ¶¶ 48-52.  JUSD advised Ms.

Tapia that her conduct constituted violation of Education Code 220, and JUSD's Board Policies 5145.3, 5145.9, and 4119.21, which prohibit discrimination and harassment, intimidation, bullying, and behavior that is motivated by hate, among other directives. FAC, ¶¶ 53-57.

JUSD allowed Ms. Tapia to cure her deficiencies by directing her to (1) refer to students by their preferred gender pronouns, (2) refrain from publicly posting her faith and opinions on social media, and (3) refrain from discussing her religious beliefs or the Bible with students, (4) agree to treat students with respect and dignity, (5) use good judgment when interacting with students, (6) act in a professional manner at work, (7) comply with Board Policies and Education Code § 220, (8) withhold information from parents about their student's preferred pronoun, (9) allow transgender students to use the bathroom or locker room that matches their preferred sex.  (FAC, ¶¶ 58-65.)  These directives caused Ms. Tapia to choose between her job and violating her religious beliefs, causing her to go out on medical leave.  (FAC, ¶ 66-67.)

On December 19, 2022, Ms. Tapia, through her union, informed JUSD that she could not comply with the Directives.  (FAC, ¶ 68, Exhibit C.)  With respect to Directive # 1, Ms. Tapia wrote:

> "Addressing students by their preferred name and preferred gender pronouns. Staying true to my faith and beliefs, I can and will only refer to students by the name and gender/pronouns provided by their parents/legal guardians on school paperwork during enrollment, which is provided to me on my rosters/attendance sheets. **The lies and confusion that children are fed in terms of "you aren't who you were created to be" is based in evil and I will not take part in that. I believe that God created male and female.** I also believe that God is love and defines love. Therefore, the best thing that I can do to support students and equip them for a bright future is to love and encourage them in who they were created to be, **and that is what they were born as, either male or female**.  (FAC, Exhibit C.) (Emphasis added.)

With respect to Directive # 2, Ms. Tapia wrote:

> "**Refrain from publicly posting content on your social media pages**

3

**that adversely affects your relationships with students**... I do not have control over what a student can find on social media and what they will decide to be affected by. It is my constitutional right to share my beliefs, opinions, and stances on my personal pages if that is what I choose to do. I do not post content directed at or about students. I believe we can all agree that there is always someone offended in today's day and age, no matter what is said or done. I believe we ought to be teaching students what real life looks like: varying beliefs and opinions that don't always match our own, **however that does not mean we need to take someone's belief and allow it to affect us personally**. (FAC, Exhibit C.) (Emphasis added.)

With respect to Directive # 3, Ms. Tapia wrote:

"Refrain from discussing religious beliefs or the Bible with students
I serve, follow, and work for the Lord above all else. He has called me to be prepared with an answer for the hope I have, for anyone who comes asking. Therefore, if and when a student feels safe and comfortable enough to come to me with a faith-based question as has happened in the past, I will provide an answer for them. I will not "preach to" or "pray" with them, but I will do my best to provide them with the answer they are searching for. There could very well be no other person in this child's life to help them navigate this and **God has called me to share the truth without wavering**." (FAC, Exhibit C.) (Emphasis added.)

Ms. Tapia concluded by stating:

Last but far from least, the directive I was given vocally at our last meeting on September 30, 2022, but I am not seeing or locating in writing, which is: "to withhold information and lie to parents about their student's name/gender/pronoun preference". This is unfathomable to me. In Education Code section 44932 (4) it states that I can be dismissed for "dishonesty". However, dishonesty is okay, as a matter of fact expected of me, in the unique circumstance of speaking with a parent who has a child with gender dysphoria. **I will not purposely lie and withhold information from parents about their child, as I am a parent myself and would be furious if this was done to me. This is infringing upon parental rights.** (FAC, Exhibit C.) (Emphasis added.)

Although Ms. Tapia offered potential accommodations, on or about January 18, 2023, the District determined that it could not accommodate Ms. Tapia's religious beliefs

4

without violating California and federal law, "aimed at protecting students and providing all students, a discrimination and harassment free learning environment", which was purportedly without justification, and was purportedly arbitrary and discriminatory.  FAC, ¶¶ 75-93.

On January 30, 2023, JUSD released Ms. Tapia from employment because she was unwilling to agree to the Directives that violated her sincerely held religious beliefs, because the District was unable to accommodate her beliefs.  FAC, ¶¶ 95-101.

## B.    SUMMARY OF RELEVANT STATE AND FEDERAL LAWS/EXECUTIVE ORDERS IN PLACE AS RELATED TO TRANSGENDER STUDENTS

The District respectfully requests from this Court to take judicial notice of the following pertinent state and federal laws/executive orders in place, in relation to transgender students.

1.    California Education Code § 35183(a)(1), states in pertinent part: "The children of this state have the right to an effective public school education. Both students and staff of the primary, elementary, junior and senior high school campuses have the **constitutional right to be safe and secure in their persons at school**."

2.    California Education Code § 200, states in pertinent part: "It is the policy of the State of California to **afford all persons in public schools**, regardless of their disability, **gender, gender identity, gender expression**, nationality, race or ethnicity, religion, sexual orientation, or any other characteristic that is contained in the definition of hate crimes set forth in Section 422.55 of the Penal Code, including immigration status, **equal rights, and opportunities** in the educational institutions of the state."

3.    California Education Code § 201(a) states that "[a]ll pupils have the right to participate fully in the educational process, free from discrimination and harassment."  California Education Code § 201(b) states that "California's public schools have an affirmative obligation to combat racism, **sexism**, **and other forms of**

**bias**, and a responsibility to **provide equal educational opportunity**." California Education Code § 201(d) states that "[t]here is an urgent need to prevent and respond to **acts of hate violence and bias-related incidents** that are occurring at an increasing rate in California's public schools." California Education Code § 201(e) states that "[t]here is an urgent need to teach and inform pupils in the public schools about their rights, as guaranteed by the federal and state constitutions, in order to increase pupils' awareness and understanding of their rights and the rights of others, with the intention of **promoting tolerance and sensitivity in public schools** and in society as a means of responding to potential harassment and hate violence." Furthermore, "[i]t is the intent of the Legislature that each public school undertake educational activities to counter discriminatory incidents on school grounds and, within constitutional bounds, **to minimize and eliminate a hostile environment on school grounds** that impairs the access of pupils to equal educational opportunity." California Education Code § 201(f).

4. California Education Code § 210.7 defines "gender" to include "a person's gender-related appearance and behavior **whether or not stereotypically associated with the person's assigned sex at birth**.

5. California Education Code § 220 states that "[n]o person shall be subjected to discrimination on the basis of disability, **gender, gender identity, gender expression**, nationality, race or ethnicity, religion, sexual orientation, or any other characteristic that is contained in the definition of hate crimes set forth in Section 422.55 of the Penal Code, including immigration status, in any program or activity conducted by an educational institution that receives, or benefits from, state financial assistance, or enrolls pupils who receive state student financial aid."

6. California Education Code § 221.5(a) states that "[i]t is the policy of the state that elementary and secondary school classes and courses, including nonacademic and elective classes and courses, be conducted, without regard to the sex of the pupil enrolled in these classes and courses." California Education Code § 221.5(f) states that

"[a] pupil shall be permitted to participate in sex-segregated school programs and activities, including athletic teams and competitions, **and use facilities consistent with his or her gender identity**, **irrespective of the gender listed on the pupil's records**."

7.     California Education Code § 233.5(a) states that "[e]ach **teacher shall endeavor to impress upon the minds of the pupils the principles of morality, truth, justice**, patriotism, and a true comprehension of the rights, duties, and dignity of American citizenship, and the meaning of **equality and human dignity, including the promotion of harmonious relations**, kindness toward domestic pets and the humane treatment of living creatures, to teach them to avoid idleness, profanity, and falsehood, and to instruct them in manners and morals and the principles of a free government." California Education Code § 233.5(b) states that "[e]ach teacher is also encouraged to create and foster an environment that encourages pupils to realize their full potential and that is **free from discriminatory attitudes, practices**, events, or activities, in order to prevent acts of hate violence, as defined in subdivision (e) of Section 233."

8.     California Education Code § 234.1 **mandates** that school **districts adopt a policy prohibiting discrimination, harassment, intimidation and bullying** based on the above categories at school or in any school activity related to school attendance or under the authority of the district. **California Education Code §234.1 further requires districts to adopt a process requiring school personnel to immediately intervene**, when it is safe to do so, **whenever they witness acts of discrimination**, **harassment, intimidation or bullying** based on the characteristics specified in Education Code sections 220 or 234.1 or Penal Code Section 422.55, **including gender identity**.

9.     California Constitution, Article I, § 1, states that "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

10.     California Constitution, Article I, § 28(a)(7) states that "the People find and declare that the right to public safety extends to public and private primary, elementary, junior high, and senior high school, and community college, California State University, University of California, and private college and university campuses, where **students and staff have the right to be safe and secure in their persons**." California Constitution, Article I, § 28(f)(1) states that the People of California hold these rights: "Right to Safe Schools.  All students and staff of public primary, elementary, junior high, and senior high schools, and community colleges, colleges, and universities have the inalienable right to attend campuses which are safe, secure and peaceful."

11.     The California Department of Education has released an FAQ, to assist school districts with understanding and implementing policy changes related to AB 1266 and transgender student privacy, facility use, and participation in school athletic competitions.  The FAQ states, in pertinent part, as follows:

> 6. <u>May a student's gender identity be shared with the student's parents, other students, or members of the public?</u>
> A transgender or gender nonconforming student may not express their gender identity openly in all contexts, including at home. **Revealing a student's gender identity or expression to others may compromise the student's safety. Thus, preserving a student's privacy is of the utmost importance. The right of transgender students to keep their transgender status private is grounded in California's antidiscrimination laws as well as federal and state laws.** Disclosing that a student is transgender without the student's permission may violate California's antidiscrimination law by increasing the student's vulnerability to harassment and may violate the student's right to privacy.
>
> 7. <u>What steps should a school or school district take to protect a transgender or gender nonconforming student's right to privacy?</u>
> Pursuant to the above protections, schools must consult with a transgender student to determine who can or will be informed of the student's transgender status, if anyone, including the student's family. **With rare exceptions, schools are required to respect the limitations that a**

8

**student places on the disclosure of their transgender status, including not sharing that information with the student's parents.** In those very rare circumstances where a school believes there is a specific and compelling "need to know," the school should inform the student that the school intends to disclose the student's transgender status, giving the student the opportunity to make that disclosure her or himself. Additionally, schools must take measures to ensure that any disclosure is made in a way that reduces or eliminates the risk of re-disclosure and protects the transgender student from harassment and discrimination. Those measures could include providing counseling to the student and the student's family to facilitate the family's acceptance and support of the student's transgender status…

8. <u>What is a school or school district's obligation when a student's stated gender identity is different than the student's gender marker in the school's or district's official records?</u>

**If a student so chooses, district personnel shall be required to address the student by a name and the pronouns consistent with the student's gender identity, without the necessity of legal documentation or a change to the student's official district record.** The student's age is not a factor. For example, children as early as age two are expressing a different gender identity. It is strongly suggested that teachers privately ask transgender or gender nonconforming students at the beginning of the school year how they want to be addressed in class, in correspondence to the home, or at conferences with the student's parents.

**<u>If a member of the school community intentionally uses a student's incorrect name and pronoun, or persistently refuses to respect a student's chosen name and pronouns, that conduct should be treated as harassment</u>. That type of harassment can create a hostile learning environment, violate the transgender student's privacy rights, and increase that student's risk for harassment by other members of the school community.** Examples of this type of harassment include a teacher consistently using the student's incorrect name when displaying the student's work in the classroom, or a transgender student's peers referring to the student by the student's birth name during class, but would not include unintentional or sporadic occurrences. **<u>Depending on the circumstances, the school's failure to address known</u>**

**incidents of that type of harassment may violate California's antidiscrimination laws**.

12.     Following the events surrounding Ms. Tapia, Assembly member, Bill Essayli (R-Riverside), sponsored Assembly Bill 1314 (Titled Gender identity: parental notification), which provides in part that a parent or guardian has the right to be notified in writing within 3 days from the date any teacher, counselor, or employee of the school becomes aware that a pupil is identifying at school as a gender that does not align with the child's sex on their birth certificate, other official records, or sex assigned at birth, using sex-segregated school programs and activities, including athletic teams and competitions, or using facilities that do not align with the child's sex on their birth certificate, other official records, or sex assigned at birth.  The assembly bill is currently referred to the Committee on Education.

13.     On March 8, 2021, President Biden issued Executive Order 14021, which stated, in pertinent part: "It is the policy of my Administration that all students should be guaranteed an educational environment free from discrimination on the basis of sex, including discrimination in the form of sexual harassment, which encompasses sexual violence, and **including discrimination on the basis of sexual orientation or gender identity**. **For students attending schools and other educational institutions that receive Federal financial assistance, this guarantee is codified**, in part, in Title IX of the Education Amendments of 1972, 20 U.S.C. 1681 et seq., **which prohibits discrimination on the basis of sex in education programs or activities receiving Federal financial assistance.**"

14.     On June 22, 2021, the U.S. Department of Education issued a Policy Letter on Transgender Students, explaining how schools are required to treat transgender students under Title IX.  Under this policy, all schools, including K-12 schools, which receive federal funding, will be subject to the requirements of Title IX, and the Department's Office for Civil Rights is responsible for investigating complaints made

10

1  by students and parents.

2      15.    The United States Department of Education has published an Education

3  Toolkit that includes examples of policies and practices that schools and districts can

4  consider developing to support LGBTQI+ students and families.  One of the suggestions

5  includes: "**Facilitating opportunities for students to find support from peers,**

6  **teachers, and staff**, such as student-led organizations, and identifying supportive

7  spaces on campus."

8      Consistent with the state and federal laws and regulations and the Executive

9  Order, JUSD also has Board Policies, as follows:

10      16.    Board Policy 5145.9 states that the Governing Board is committed to

11  providing a respectful, inclusive, and safe learning environment that protects students

12  from discrimination, harassment, intimidation, bullying, or any other type of behavior

13  that is motivated by hate, and defines hate-motivated behavior is any behavior intended

14  to cause emotional suffering, physical injury, or property damage through …

15  intimidation, harassment… motivated in part or in whole by bias or hostility toward the

16  victim's real or perceived… sex, sexual orientation, gender, gender identity, gender

17  expression, or genetic information."

18      17.    Board Policy 5145.3, titled Nondiscrimination/Harassment, states that the

19  policy applies to all acts constituting unlawful discrimination or harassment related to

20  school activity or to school attendance occurring within a district school, **and to acts**

21  **which occur off campus or outside of school-related or school-sponsored activities**

22  **but which may have an impact or create a hostile environment at school**.

23  **II.    LEGAL STANDARD**

24

25  **A. MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)**

Pursuant to Fed. R. Civ. P. l2(b)(6), a pleading may be dismissed if the pleading

26  fails "to state a claim upon which relief can be granted."  A Rule 12(b)(6) motion for

27  dismissal is proper where there is either a "lack of a cognizable legal theory" or "the

28

11

1  absence of sufficient facts alleged under a cognizable legal theory."  *Balistreri v.*
2  *Pacifica Police Dept.*, 901 F2d 696, 699 (9th Cir. 1990).

3        The complaint "must [provide] sufficient allegations of underlying facts to give
4  fair notice and to enable the opposing party to defend itself effectively."  *Starr v. Baca*,
5  652 F.3d 1202, 1216 (9th Cir. 2011).  Furthermore, the underlying factual allegations
6  must "plausibly suggest an entitlement to relief."  *Id.*; *see also*, *Caltex Plastics, Inc. v.*
7  *Lockheed Martin Corporation*, 824 F.3d 1156, 1159 (9th Cir. 2016).  To survive a
8  motion to dismiss, a complaint must contain "sufficient factual matter to state a facially
9  plausible claim."  *Shroyer v. New Cingular Wireless Services, Inc.*, 622 F.3d at 1041
10  (9th Cir. 2010).

11        "[T]here is no reason not to grant a motion to dismiss where the undisputed facts
12  conclusively establish an affirmative defense as a matter of law."  *Hensley Mfg. v.*
13  *ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009).  Where a court grants a Rule 12(b)(6)
14  motion based on an affirmative defense, the facts establishing that defense must: (1) be
15  definitively ascertainable from the complaint and other allowable sources of
16  information, and (2) suffice to establish the affirmative defense with certitude.  *Gray v.*
17  *Evercore Restructuring L.L.C.*, 544 F.3d 320, 324 (1st Cir. 2008).

18        The general rule is that a district court, in ruling on a Rule 12(b)(6) motion, cannot
19  consider materials outside of the complaint.  However, there are exceptions to this general
20  rule.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001); *Khoja v. Orexigen*
21  *Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018), cert. denied sub nom. *Hagan v.*
22  *Khoja* (U.S., May 20, 2019, No. 18-1010) 2019 WL 429555.  In ruling on a Rule
23  12(b)(6) motion, courts may consider documents attached to the complaint, judicially
24  noticed documents, and documents that were incorporated by reference in the pleading.
25  *See U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Van Buskirk v. CNN*, 284 F.3d
26  977, 980 (9th Cir. 2002); *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994).  Courts
27  can expand the facts and inferences from the complaint with "data points gleaned from

28

12

documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *Haley v. City of Boston,* 657 F.3d 39, 46 (1st Cir. 2011).  Moreover, "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."  Federal Rules of Civil Procedure, Rule 10(c).  "[A] general description of an exhibit attached to a complaint will be disregarded where inconsistent with the exhibit." *B & P Development Corp. v. City of Saratoga* (1986) 185 Cal.App.3d 949, 953.  "Exhibits attached to the complaint take precedence to the extent they contradict allegations in the complaint." *Bank of New York Mellon v. Citibank, N.A.* (2017) 8 Cal.App.5th 935, 943 [214 Cal.Rptr.3d 504, 510], as modified (Mar. 1, 2017).  "When a written instrument contradicts allegations in a complaint to which it is attached, *the exhibit trumps the allegations.*" *Thompson v. Illinois Dept. of Prof. Reg.*, 300 F.3d. 750, 754 (7th Cir. 2002) (emphasis in original; internal quotes omitted); *Sprewell v. Golden State Warriors*, 266 F.3d. 979, 988 (9th Cir. 2001).  Furthermore, courts may disregard allegations in a complaint if such allegations "conflict with the legal effect of…judicially noticeable exhibits and documents in the public record." *Kalnoki v. First American Trustee Servicing Solutions, LLC* (2017) 8 Cal.App.5th 23, 38 [214 Cal.Rptr.3d 292, 304], reh'g denied (Feb. 22, 2017), review denied (May 10, 2017).  Plainly speaking, courts can disregard allegations in the complaint if they are contradicted by claims in the exhibits to the complaint. *Nishimatsu Const. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).

## III. PLAINTIFF'S FIRST, SECOND, THIRD, AND SIXTH CAUSES OF ACTION FOR VIOLATION OF CIVIL RIGHTS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

### A. DEFENDANTS TRENTON HANSON AND DANIEL BROOKS ARE ENTITLED TO QUALIFIED IMMUNITY

"Individual defendants sued in their personal capacities may be liable for damages under Section 1983, if the doctrine of qualified immunity does not apply."

13

1    *Harper v. Poway Unified School District,* 345 F.Supp. 1096, 1116 (S.D. Cal. 2004),

2    citing *Price v. Akaka,* 928 F.2d 824, 828, (9th Cir. 1990); *Cerrato v. San Francisco*

3    *Community College Dist.,* 26 F.3d 968, 973, n. 16 (9th Cir. 1994). "Qualified immunity

4    protects government officials 'from liability for civil damages insofar as their conduct

5    does not violate clearly established statutory or constitutional rights of which a

6    reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231

7    (2009). Qualified immunity applies regardless of whether the government official's

8    error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of

9    law and fact." *Groh v. Ramirez*, 540 U.S. 551, 567 (2004). The doctrine of qualified

10   immunity protects government officials "from liability for civil damages insofar as their

11   conduct does not violate clearly established statutory or constitutional rights of which a

12   reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

13   It "gives government officials breathing room to make reasonable but mistaken

14   judgments," and "protects 'all but the plainly incompetent or those who knowingly

15   violate the law'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v.*

16   *Briggs*, 475 U.S. 335, 341 (1986).) "The offending official, so long as he conducts

17   himself in good faith, may go about his business secure in the knowledge that a qualified

18   immunity will protect him from personal liability for damages that are more

19   appropriately chargeable to the populace as a whole." *Owen v. City of Independence,*

20   *Mo.* (1980) 445 U.S. 622, 657.

21        Both the Supreme Court and the Ninth Circuit have consistently held that the

22   doctrine of qualified immunity shields "'government officials performing discretionary

23   functions ... from liability for civil damages ...'" *Lytle v. Wondrash,* 182 F.3d 1083,

24   1086, (9th Cir. 1999); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, (1982); *Downing v.*

25   *West Haven Board of Ed.,* 162 F.Supp.2d 19, 29-30, (2001); *Harper, supra,* 345 F.Supp.

26   at 1117, citing *Hunter v. Bryant,* 502 U.S. 224, 229, (1991). In *Harlow v. Fitzgerald,*

27   the court held that "government officials performing discretionary functions generally

28

MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 5:23-cv-00789-FMO-E - 14

1    are shielded from liability for civil damages insofar as their conduct does not violate

2    clearly established statutory or constitutional rights of which a reasonable person would

3    have known." *Harlow, supra,* 457 U.S. at 818.  In *White v. Pauly*, 137 S.Ct. 548, 552

4    (2017) (per curiam), the Supreme Court held that "clearly established law" should not

5    be defined at a high level of generality and must be particularized to the facts of the

6    case. *Ashcroft v. al-Kidd*, 563 U.S. 731,741 (2011) (citation omitted).   "'For a

7    constitutional right to be clearly established, its contours must be sufficiently clear that

8    a reasonable official would understand that what he is doing violates that right.'"

9    *Mansourian v. Board of Regents of the University of California at Davis* (E.D. Cal.

10   2010) 757 F.Supp.2d 1030, 1048 quoting *Hope v. Pelzer* 536 U.S. 730, 739 (2002)

11   (internal quotation marks omitted).

12          Because it is an immunity from suit, whether qualified immunity applies should

13   be determined by the Court at the earliest stage possible. *See, Martinez v. Cty. of Los*

14   *Angeles*, 47 Cal. App. 4th 334 (1996), citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)

15   ("Immunity should ordinarily be resolved by the court, not a jury.")

16          Ms. Tapia was a teacher employed by JUSD, a public entity, and she has made

17   fatal admissions in her complaint, specifically in Exhibit "C" of her FAC, wherein she

18   admits that her religious beliefs mandated her to violate several provisions of state and

19   federal laws and regulations.  Specifically, Ms. Tapia wrote to the District that she

20   would "only refer to students by the name and gender/pronouns provided by their

21   parents/legal guardians on school paperwork during enrollment." (FAC, Exh. C.)  Ms.

22   Tapia's refusal to abide by the directive to refer to students by their preferred pronoun

23   results in a violation of California Education Code §§ 200 and 201 because her refusal

24   would constitute harassment under California's anti-discrimination laws, as determined

25   by the California Department of Education.  (See Request for Judicial Notice ("RJN"),

26   Exh. 8, FAQ No. 8).  Furthermore, this type of harassment can also create a hostile

27   learning environment, would violate the transgender student's privacy rights, and

28

increase that student's risk for harassment by other members of the school community. *Id*. Furthermore, as determined by the United States Department of Education, and based on President Biden's Executive Order 14021, the District could face liability for violation of Title IX, and would result in loss of federal funding. (See RJN, Exh. 13-15.) Not only would JUSD potentially face loss of federal funding if it allowed Ms. Tapia to continue violating this directive, it could also face anti-discrimination lawsuits by transgender students and their parents for multiple violations of state and federal anti-discrimination laws.

Furthermore, Ms. Tapia refused to abide by the District's directive to affirm a child's preferred gender and allow them to use the locker room or bathroom of their choice. FAC, ¶ 62, 67, 84. Ms. Tapia's refusal to abide by this directive was a direct violation of California Education Code § 210.7 and § 221.5(f), which states that "[a] pupil shall be permitted to participate in sex-segregated school programs and activities, including athletic teams and competitions, and use facilities consistent with his or her gender identity, irrespective of the gender listed on the pupil's records."

Furthermore, in response to Directive No. 2 to refrain from posting content on social media pages that would adversely affect relationship with her students, Ms. Tapia specifically wrote to the District that she refused to do so, claiming that her posts were not directed to the students, and varying beliefs and opinions do not always match someone else's belief. By refusing to refrain from posting offensive content about transgender students on her social media account (i.e. Instagram), Ms. Tapia violated California Education Code §§ 201, 220, 210.7, 221.5(a), 233.5(a), California Constitution, Article I, § 28(a)(7) and 28(f)(1), and Title IX, as determined by President Biden's Executive Order 14021, and the United States Department of Education. (See Request for Judicial Notice 13, and 14.)

Ms. Tapia further refused to refrain from discussing her religious beliefs, and also made it clear in her letter to the District that she would not withhold information from

MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 5:23-cv-00789-FMO-E - 16

parents about their child, if the child identified as a transgender student.  FAC, ¶¶ Exh. C.  By refusing to comply with the District's directive in respecting the privacy rights of transgender students, Ms. Tapia was in direct violation of transgender student privacy rights, as determined by the California Department of Education.  (See RJN, Exh. 11.)  In summary, Ms. Tapia has admitted in her complaint that her religious beliefs compelled her to violate state and federal laws, regulations, and an executive order from the President of the United States, which would result in lawsuits from transgender students and their parents, investigations by both the United States Department of Education, Office of Civil Rights, (which would potentially lead to cutting of the District's federal funds), and further investigation from the California Department of Education.  Ms. Tapia's religious beliefs and her refusal to comply with the District's directives essentially turned her into a walking liability for both the District, and also for the entire set of staff and students at JUSD who could potentially face loss of federal funding if the school administrators did not take action to correct her behavior.

Faced with these concerns, individual defendants Mr. Hansen and Mr. Brooks, who were the Superintendent and Assistant Superintendent at JUSD, had to act immediately to address Ms. Tapia's conduct, which had resulted in several students filing a complaint with the District.  In compliance with their duties, Mr. Hansen and Mr. Brooks carried out their responsibilities under Board Policy 5145.9 and 5145.3 to investigate the complaints from the students against Ms. Tapia and correct her behavior.  As Plaintiff admits in her complaint, she was given a chance to comply with the directives, and as admitted by Ms. Tapia, she refused to comply with the state and federal laws and the Executive Order in place.  Mr. Hansen and Mr. Brook's decision to terminate Plaintiff's employment with JUSD was objectively reasonable, because Plaintiff continued to insist that her religious beliefs mandated her to violate federal and California state laws.  It is important to note that at the time these events took place, Assembly Bill 1314 was not even introduced, and the legislation is still pending review

by the Education Committee.  (RJN, Exh. 12.)

Once a government official asserts qualified immunity, "the district court must determine whether, in light of clearly established principles governing the conduct in question, the officer objectively could have believed that his conduct was lawful." *Act Up!/Portland v. Bagley,* 988 F.2d 868, 871 (9th Cir.1993). This requires a two-step analysis: "1) Was the law governing the official's conduct clearly established? 2) Under that law, could a reasonable officer have believed the conduct was lawful?" *Id.* An official is entitled to qualified immunity even where reasonable officers could disagree as to the lawfulness of the official's conduct, so long as that conclusion is objectively reasonable. *Id.* at 872.

Here, it was entirely reasonable, from an objective standard, for Mr. Hansen and Mr. Brooks to give an opportunity to Ms. Tapia to correct her actions.  When that failed, and when Ms. Tapia made it clear that she would continue to violate state and federal laws, it was entirely reasonable for Mr. Hansen and Mr. Brooks to terminate Ms. Tapia's employment.  In fact, if Mr. Hansen and Mr. Brooks did not take any action, the transgender students and their parents could file a lawsuit against the District for violation of California's anti-discrimination laws, as determined by the California Department of Education. (RJN, Exh. 11.)  Furthermore, an investigation by the Office of Civil Rights into the complaints, and a determination that Mr. Hansen and Mr. Brooks failed to take action, could result in loss of federal funding to JUSD, which would be detrimental to all the students and staff.

Here, the Plaintiff relies only on a broad due process right, right of free speech and free exercise, and first amendment retaliation, to justify her claim that she should have been admitted to continue to violate state and federal laws and regulations because of her religious beliefs.  These vague references to her constitutional rights are clearly not applicable to the facts of this case, in that a reasonable official would find the unlawfulness of her conduct to be apparent. Both the California statutes, and federal

18

MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 5:23-cv-00789-FMO-E - 18

laws and regulations, along with the Board Policies that JUSD has in place, required and mandated Mr. Hansen and Mr. Brooks to take whatever steps were necessary to protect the rights of the transgender students.

As the Supreme Court has noted, "[t]he central purpose of affording public officials qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald,* 457 U.S. 800, 806 (1982).    Mr. Hansen and Mr. Brooks are entitled to qualified immunity against Plaintiff's § 1983 claims. Again, the Court's objective inquiry is whether "the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor,* 490 U.S. 386, 397 (1989). Because Mr. Hansen and Mr. Brooks' actions were reasonable, they are entitled to the protection of qualified immunity.

## B.  TRENTON HANSON AND DANIEL BROOKS AND JURUPA UNIFIED SCHOOL DISTRICT ARE ENTITLED TO ELEVENTH AMENDMENT IMMUNITY

It has long been clearly established that public K-14 educational institutions in California, which includes school districts, are state agencies for purposes of Eleventh Amendment sovereign immunity. (*Mitchell v. Los Angeles Community College District*, 861 F.2d 198, 201 (9th Cir. 1988), *cert. denied* (community college districts); *Sato v. Orange County Dep't of Education*, 861 F.3d 923, 934 (9th Cir. 2017) (school districts and county offices of education); *Eaglesmith v. Ward*, 73 F.3d 857 (9th Cir. 1995) (county offices of education); *Belanger v. Madeira Unified Sch. Dist.*, 963 F.2d 248 (9th Cir. 1992) (school districts).)  Plaintiff therefore has not and cannot state a claim against the Defendants (against JUSD and the individual defendants in their official capacity) under any of the causes of action asserted on constitutional grounds or pursuant to 42 U.S.C. § 1983.  A sovereign immunity defense is quasi-jurisdictional and

1    therefore may be raised in either a Rule 12(b)(6) or a Rule 12(b)(1) motion. (*Sato,* 861

2    F.3d 923, 927 n. 2.)

3         School Districts are state entities that possess Eleventh Amendment immunity

4    from Section 1983 claims in damages and for injunctive relief. *Mitchell v. Los Angeles*

5    *Community College Dist.*, 861 F.2d 198, 201 (9th Cir. 1988). The individual defendants

6    share in the JUSD's Eleventh Amendment immunity when they are sued in their official

7    capacities. *Id*. There is an exception to this general rule, however, that an official-

8    capacity suit is not barred by the Eleventh Amendment when the suit is brought for

9    prospective injunctive relief. *Doe v. Lawrence Livermore Nat. Laboratory*, 131 F.3d

10   836, 839 (9th Cir. 1997) (citing *Ex Parte Young*, 209 U.S. 123 (1908)).  The exact relief

11   Plaintiff requests in her Complaint has been held by the U.S. Supreme Court, and the

12   9th Circuit Court of Appeals, as official-capacity suits that are not barred by the

13   Eleventh Amendment. *Lawrence Livermore*, 131 F.3d at 839; *Couer d'Alene Tribe of*

14   *Idaho*, 521 U.S. at 294; *Will*, 491 U.S. at 71 n.10 (1989); *Ex Parte Young*, 209 U.S. 123

15   (1908); *Goodisman*, 724 F.2d at 820.  However, the *Ex parte Young* doctrine does not

16   apply to the JUSD and its Superintendent and Assistant Superintendent. These entities

17   are not subject to suit under Section 1983, for any form of relief, because they are state

18   agencies for purposes of the Eleventh Amendment, and as such, therefore are not

19   "persons" who are subject to suit within the statutory meaning of Section 1983. *Will v.*

20   *Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Therefore, all 1983 claims

21   against JUSD and the individual defendants must be dismissed.

22   Dated: August 18, 2023                    Respectfully Submitted,
                                                WALSH & ASSOCIATES, APC

23

24

25   _____

26                                              Dennis J. Walsh, Esq.

27                                              Arash Arjang, Esq.
                                                Attorneys for Defendants

28                                                    20