1

**WALSH & ASSOCIATES, APC**
16633 Ventura Boulevard, Suite 800
Encino, CA 91436
Telephone: (818) 986-1776
Facsimile: (818) 382-2071
DENNIS J. WALSH, Esq. (SBN 106646)
Email: dwalsh@walshlawyers.com
ARASH ARJANG, Esq. (SBN 276237)
Email: aarjang@walshlawyers.com

Attorneys for Defendants, JURUPA UNIFIED
SCHOOL DISTRICT, TRENTON HANSEN, and
DANIEL BROOKS

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSICA TAPIA, an individual,<br><br>Plaintiff,<br><br>v.<br><br>JURUPA UNIFIED SCHOOL DISTRICT; TRENTON HANSEN, both in his personal capacity and in his official capacity as the Jurupa Unified School District Superintendent; DANIEL BROOKS, both in his personal capacity and in his official capacity as Jurupa Unified School District Assistant Superintendent,<br><br>Defendants. | Case No.: 5:23-cv-00789-FMO-E<br><br>**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**<br><br>Date:  September 21, 2023<br>Time: 10:00 a.m.<br>Place: Courtroom 6D<br>   350 W. 1st Street<br>   Los Angeles, CA 90012<br><br>Hon. Fernando M. Olguin, United States District Judge<br><br>Magistrate Judge: Hon. Charles F. Eick<br><br>Action Date:May 3, 2023<br>Trial date:   Not Set |

MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 5:23-cv-00789-FMO-E - 1

## MEMORANDUM OF POINTS AND AUTHORITIES

I. **PLAINTIFF HAS FAILED TO MEET HER BURDEN TO CITE TO A SINGLE CASE THAT STANDS FOR THE PROPOSITION THAT DEFENDANTS TRENTON HANSEN AND DANIEL BROOKS VIOLATED A CLEARLY ESTABLISHED RIGHT**

Where a defendant properly raises the defense of qualified immunity, "[i]t is the **plaintiff who bears the burden of showing** that the rights allegedly violated [are] clearly established." *Shafer v Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017). In both her First Amended Complaint ("FAC"), and in her opposition, Ms. Tapia has clearly failed to meet her burden of showing that her constitutional rights which were purportedly violated were clearly established at the time of the violations. Instead of focusing on meeting her burden, Ms. Tapia incorrectly asserts that Defendants Trenton Hansen and Daniel Brooks ("Mr. Hansen and Mr. Brooks") failed to address the first prong of the qualified immunity test (which Mr. Hansen and Mr. Brooks vehemently deny), and as a result, Mr. Hansen and Mr. Brooks should not be allowed to raise the defense of qualified immunity. This argument is flawed because first, Mr. Hansen and Mr. Brooks did state in their motion to dismiss that throughout her FAC, Plaintiff has only made "vague references to her constitutional rights" which were not "applicable to the facts of this case." (Mtn. p. 18, lines 25-26). Second, and more importantly, to determine whether qualified immunity applies, the "two prongs of the analysis **need not be considered in any particular order**, and **both prongs must be satisfied** for a plaintiff to overcome a qualified immunity defense." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017); see also *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)("*Pearson*")(stating "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.") In their motion to dismiss,

Mr. Hansen and Mr. Brooks chose to focus their argument on the second prong of the qualified immunity defense under the guidance of the United States Supreme Court in *Pearson*, which reasoned as follows, in pertinent part:

> "At the same time, however, the rigid *Saucier* procedure comes with a price. The procedure sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case. There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right. District courts and courts of appeals with heavy caseloads are often understandably unenthusiastic about what may seem to be an essentially academic exercise.
>
> Unnecessary litigation of constitutional issues also wastes the parties' resources. Qualified immunity is "an immunity from suit rather than a mere defense to liability." Mitchell, 472 U.S., at 526, 105 S.Ct. 2806 (emphasis deleted). Saucier's two-step protocol "disserve[s] the purpose of qualified immunity" when it "forces the parties to endure additional burdens of suit—such as the costs of litigating constitutional questions and delays attributable to resolving them—when the suit otherwise could be disposed of more readily."
>
> …
>
> When presented with a constitutional question on which this Court had just granted certiorari, the Ninth Circuit elected to "bypass Saucier's first step and decide only whether [the alleged right] was clearly established."
>
> …
>
> Although the *Saucier* rule prescribes the sequence in which the issues must be discussed by a court in its opinion, the rule does not—and obviously cannot—specify the sequence in which judges reach their

1   conclusions in their own internal thought processes. Thus, there will be
2   cases in which a court will rather quickly and easily decide that there was
3   no violation of clearly established law before turning to the more difficult
4   question whether the relevant facts make out a constitutional question at
5   all.

6   (*Id*. at 236-239.)

7        Under the guidance from *Pearson*, Mr. Hansen and Mr. Brooks have raised the
8   defense of qualified immunity, requesting this Court to decide as matter of law whether
9   Mr. Hansen and Mr. Brooks' conduct in allowing Ms. Tapia to correct her behavior,
10  and subsequently terminating her employment when she refused to correct her behavior,
11  was objectively reasonable, such that Mr. Hansen and Mr. Brooks would have
12  reasonably believed that their conduct was lawful, given clearly established law and the
13  information they possessed at the time. *Anderson v. Creighton*, 483 U.S. 635, 641
14  (1987). The issue to be decided is whether Mr. Hansen and Mr. Brooks should be held
15  legally responsible for monetary damages for issuing the "Directives" to Ms. Tapia to
16  allow her to correct her behavior and remain an employee of the District, and
17  subsequently terminating her employment when she refused to follow the "Directives".
18  (FAC, Exh. C.)

19       As noted in the moving papers, Ms. Tapia has made fatal admissions in her FAC,
20  specifically in "Exhibit C", in that her religious beliefs mandated her to only refer to
21  students by their name and gender pronouns that were on her roster, as opposed to the
22  student's preferred pronoun, resulting in a direct violation of California's harassment
23  and anti-discrimination laws, and in the event that the District failed to correct this
24  behavior, would result in liability under California Education Code § 200, et. seq. and
25  Title IX. As noted in the dissenting opinion of Justice Alito in *Bostock v. Clayton Cnty.,*
26  *Georgia*, 140 S. Ct. 1731, 1782 (2020), "[a]fter today's decision, plaintiffs may claim
27  that the failure to use their preferred pronoun violates one of the federal laws prohibiting

28

3

sex discrimination."   Indeed, this "Directive" was consistent with the District's responsibility to provide a safe and inclusive learning environment for all students, including transgender students (especially after the Supreme Court's ruling in *Bostock*), and consistent with the District's obligations under the Equal Protection Clause, Title IX, and California Education Code § 200.[1]

Furthermore, as noted in "Exhibit C" to Ms. Tapia's FAC, Ms. Tapia specifically refused to comply with the District's directive to "refrain from publicly posting on [her] social media pages that adversely affect[ed] [her] relationship with students.  Again, as Ms. Tapia admitted in her FAC, she "received disturbing messages and comments on her personal Instagram account from alleged Jurupa Valley High School students, regarding her posts.  (FAC, ¶ 35-36.)  Had the District allowed Ms. Tapia to continue to post offensive comments about transgender students, it could face liability for failure to correct Ms. Tapia's offensive posts which expressed negative attitudes, feelings, or actions towards transgender people or transness in general.  Again, the possibility for litigation for failure to investigate and correct Ms. Tapia's views on transgender individuals is now very real under the Supreme Court's holding in *Bostock*. Furthermore, Ms. Tapia's religious belief which mandated her to refuse to comply with the directive to refrain from discussing religious beliefs or the Bible with students (See FAC, Exh. C.) has already been held by the Ninth Circuit to be unlawful.[2]

---

[1] See *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257-58 (2009), holding that the Equal Protection Clause of the Fourteenth Amendment to the Constitution protects students and allows plaintiffs to allege unconstitutional gender discrimination in schools.

[2] School district's restriction on high school biology teacher's right of free speech in prohibiting teacher from talking with students about religion during school day, including times when he was not actually teaching class, was justified by school district's interest in avoiding establishment clause violation which would result if teacher were permitted to discuss his religious beliefs with students during school time on school grounds; such speech would not have had secular purpose, would have had

4

Furthermore, and although not noted in Exhibit C, Ms. Tapia refused to comply with the District's Directive to affirm a child's preferred gender and allow them to use the locker room or bathroom of their choice.  FAC, ¶ 62, 67, 84.  Ms. Tapia's refusal to abide by this directive was a direct violation of California Education Code § 210.7 and § 221.5(f), which states that "[a] pupil shall be permitted to participate in sex-segregated school programs and activities, including athletic teams and competitions, and use facilities consistent with his or her gender identity, irrespective of the gender listed on the pupil's records."

Lastly, Plaintiff's refusal to comply with the (purported) Directive[3] to withhold information from parents related to the student's gender pronoun preference, was recently addressed by the California Attorney General ("AG") in a lawsuit filed by the AG against Chino Valley Unified School District in the County of San Bernardino, Case No. CIVSB 2317301, filed on August 28, 2023 [4] [5].  In this lawsuit, the AG has asked the San Bernardino County Superior Court to end a district policy that requires school staff to tell parents if their child asks to be identified by a different gender or name, or accesses a bathroom or program that don't align with the gender on their official records.  On September 6, 2023, the Honorable Thomas S. Garza granted the AG's ex-

---

primary effect of advancing religion, and would have entangled school with religion. *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517 (9th Cir. 1994).

[3] The District notes that this Directive, although disputed as asserted by Ms. Tapia, is the District's attempt to comply with California Department of Education's FAQ related to AB1266, Questions 6 and 7.  (See Request for Judicial Notice, Exh. 11.)

[4] For the convenience of the Court, a true and correct copy of the Complaint is attached with this reply brief as Exhibit "1", along with the Minute Order.  The District requests that the Court take judicial notice of the Complaint and the Minute Order granting the request for a Temporary Restraining Order by the California AG.

[5] The filing of this lawsuit by the AG further extinguishes any attempt by Plaintiff to argue that a potential lawsuit cannot be used as a reason to terminate her employment. The lawsuit by the AG is very real, and the same grounds can be used by transgender students to sue the District for failing to protect their constitutional rights.

5

parte application for a temporary restraining order to stop the school district from enforcing the board policy.  A destroy hearing has been scheduled regarding the issuance of a preliminary injunction on October 13, 2023.

Qualified immunity is a judicial doctrine designed to protect public officials "from undue interference with their duties and from potentially disabling **threats of liability**," *Elder v. Holloway*, 510 U.S. 510, 514 (1994), and ensure that "insubstantial claims" against government officials will be dismissed before discovery.  *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987).  Qualified immunity thus confers not only an immunity against liability, but also immunity from suit and other burdens of litigation, so long as the official did not violate clearly established law. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  "[P]ermitting damage suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson*, 483 U.S. at 638. A public official who faced monetary liability for all violations of federal laws might be unwilling to carry out their public responsibilities "with the decisiveness and the judgment required by the public good." *Scheuer v. Rhodes*, 416 U.S. 232, 240 (1974).  It is accordingly important to resolve questions of qualified immunity at the earliest possible stage of litigation. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).  In *Harlow v. Fitzgerald*, 457 U.S. 800, 800 (1982), the U.S. Supreme Court established an objective reasonableness test for qualified immunity based on whether the official violated clearly established federal law.  Under this test, an official who (purportedly) acted unconstitutionally—but did not violate *clearly established* law—will be found to have acted in an objectively reasonable manner and will be protected from personal liability by qualified immunity. *Id.*

Here, all of Plaintiff's constitutional claims against Mr. Hansen and Mr. Brooks fail because, even assuming *arguendo* that Ms. Tapia has sufficiently alleged a violation of a constitutional right, she has failed to point to a single case that stands for the

6

proposition that her constitutional right was "clearly established" at the time the District gave her the Directives, and at the time her employment was terminated because she refused to comply with the Directives.  In her FAC, Plaintiff fails to allege that her rights were clearly established in any of her claims, with the vague reference in Paragraph 167 of her FAC that clearly established law bars the government from retaliating against Americans for exercising their constitutional rights, with no citation to an actual case that stands for such proposition.  Even worse, in her opposition, Ms. Tapia fails to meet her burden by citing to a single case that stands for the proposition that Mr. Hansen and Mr. Brooks' conduct violated clearly established rights of Ms. Tapia of which any reasonable person would have known.   The question for purposes of qualified immunity is whether Mr. Hansen and Mr. Brooks could have reasonably believed that their conduct in allowing Ms. Tapia to correct her unlawful behavior, and subsequently terminating her after she refused to correct her unlawful behavior, was lawful in and of itself, given clearly established law and the information they possessed. The Court focuses on the "objective" and "fact specific" question of "whether a reasonable [official] could have believed [their actions] to be lawful, in light of clearly established law and the information [they] possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).  Ultimately, the official is entitled to qualified immunity unless "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."   *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001).  While there need not necessarily be precedent on all fours with the present case adjudging the defendants' conduct unlawful, the "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011).

As a threshold matter, under the law available to Mr. Hansen and Mr. Brooks, it was reasonable for them to allow Ms. Tapia time to familiarize herself with the laws protecting transgender students, and correct her behavior by following the Directives. Any failure to investigate the student complaints would have resulted in a host of

lawsuits and investigations by the California Department of Education and the United States Office of Civil Rights, in addition to civil lawsuits for damages by the affected students.  Mr. Hansen and Mr. Brooks were required by law and the District's board policies to investigate the student complaints and put an end to Ms. Tapia's discriminatory social media posts and discriminatory practices and beliefs.  The Directives were given to Ms. Tapia, such that she would be in compliance with state and federal laws, but instead, Ms. Tapia objected to the directives and continued to insist that her religious beliefs mandated her to violate state and federal laws.  Given the unprecedented nature of the situation, where a teacher insists on violating state and federal laws because of her religious beliefs, the contours of Ms. Tapia's constitutional rights are not "clearly established", and Mr. Hansen and Mr. Brooks acted reasonably in the absence of guidance from clearly established law.

A defendant sued under 42 U.S.C. § 1983 is entitled to qualified immunity when they acted reasonably under the circumstances and did not violate any right that was "clearly established" in light of the specific context of the case.  Plaintiff responds to this argument by trying to reframe the issue by making a vague reference that Mr. Hansen and Mr. Brooks knew or should have known that their actions violated Ms. Tapia's constitutional rights.  Yet, the only case in Ms. Tapia's opposition that she relies on has absolutely nothing to do with the specific facts in this case.  In *Jones v. Williams*, 791 F.3d 1023 (9th Cir. 2015), a Muslim former prisoner brought a civil rights action alleging (among other things) that while in prison he had selected and eaten a tamale pie that he later discovered contained pork, which violated his religious beliefs. *Id*. at 1030. Jones averred in a declaration that "Tom Peacock, [an inmate] cook, told Jones that [food service coordinator Richard] Nopp had ordered Peacock to add pork to the meat in the tamale pie and that Peacock added pork as directed while Nopp watched." *Id*. at 1029.  The facts in *Jones* have absolutely nothing to do with whether a teacher should be allowed to continue to discriminate against transgender students on the basis

8

of the teacher's religious beliefs.

Plaintiff's arguments are, ultimately, too general to overcome the high bar of qualified immunity.  As the Ninth Circuit repeatedly explained, "[f]raming the constitutional principle in . . . general terms . . . 'avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Sabra v. Maricopa Cnty. Comm. Coll. Dist.*, 44 F.4th 867, 890 (9th Cir. 2022) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). Instead, the Court's "inquiry into whether a particular right is clearly established 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

Moreover, just as Plaintiff may not frame the issues too abstractly, Plaintiff likewise may not overcome qualified immunity with merely conclusory allegations. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plaintiff instead must allege specific conduct that plausibly shows that Defendants acted in such a way that was so obviously wrong that it was unconstitutional "beyond debate." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011).  The question the Court must examine is whether Mr. Hansen and Mr. Brooks acted reasonably in the particular circumstances that they faced.  The conclusions reached by Mr. Hansen and Mr. Brooks in terminating Ms. Tapia's employment was necessitated as a result of her admitted violations of state and federal law, which if not stopped, would expose the District to significant liability and exposure from both transgender students and their parents, the California Department of Education, the California Attorney General, the United States Department of Education, Office of Civil Rights, and the potential loss of federal funding if a Title IX investigation determined that the District was in violation of Title IX for deliberate indifference to the student complaints.  Plaintiff cannot overcome these concerns by simply stating that Mr. Hansen and Mr. Brooks violated her constitutional rights by terminating her. Plaintiff also fails to explain how Mr. Hansen and Mr. Brooks could accommodate

9

Plaintiff's self-admitted violations of state and federal law. Therefore, it was entirely reasonable, from an objective standard, for Mr. Hansen and Mr. Brooks to give an opportunity to Ms. Tapia to correct her actions. When that failed, and when Ms. Tapia made it clear that she would continue to violate state and federal laws, it was entirely reasonable for Mr. Hansen and Mr. Brooks to terminate Ms. Tapia's employment. In summary, Plaintiff has failed to identify a single case where school administrators who were exercising their duty under similar circumstances to correct a school teacher's unlawful behavior were held to have violated the teacher's constitutional rights. See *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017)(holding that to satisfy this step, Plaintiff must identify a case where the state official was held to have violated the constitutional rights under similar circumstances). Her failure to meet this burden should result in the dismissal of her § 1983 claims against Mr. Hansen and Mr. Brooks. To the extent the Court is inclined to hear arguments under the first prong of the qualified immunity test, Defendants request that the Court allow the Parties to prepare supplemental briefs dealing with the first prong of the qualified immunity test.

Plaintiff also attempts to get around the eleventh amendment immunity by arguing that she is only seeking prospective relief in the form of reinstatement. However, the Ex parte Young doctrine does not apply to state entity defendants as they are not subject to suit under Section 1983, for any form of relief, because they are state agencies for purposes of the Eleventh Amendment, and as such, therefore are not "persons" who are subject to suit within the statutory meaning of Section 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). More importantly, if the Court were to grant Ms. Tapia's request for relief for reinstatement, the Court would in essence be forcing the District to continue to allow Ms. Tapia to violate federal and state law, as she has made it clear that her religious beliefs will never change, and which would expose the District to liability and loss of federal funding. As such, a prospective relief for reinstatement should not be considered as an available prospective relief.

Dated: September 7, 2023

Respectfully Submitted,
WALSH & ASSOCIATES, APC

_____
Dennis J. Walsh, Esq.
Arash Arjang, Esq.
Attorneys for Defendants

11

# EXHIBIT 1

1   ROB BONTA
    Attorney General of California
2   MICHAEL L. NEWMAN
    Senior Assistant Attorney General
3   LAURA L. FAER (SBN 233846)
    JAMES F. ZAHRADKA II (SBN 196822)
4   Supervising Deputy Attorneys General
    EDWARD NUGENT (SBN 330479)
5   GARY D. ROWE (SBN 165453)
    ALEXANDER SIMPSON (SBN 235533)
6   XIYUN YANG (SBN 315187)
    DELBERT TRAN (SBN 323993)
7   Deputy Attorneys General
    455 Golden Gate Avenue, Suite 11000
8   San Francisco, CA 94102-7004
    Telephone: (415) 229-0110
9   E-mail: Delbert.Tran@doj.ca.gov
    *Attorneys for The People of the State of California*

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

AUG 28 2023

BY: Stephanie Penuelus, Deputy

10

11                      SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                            COUNTY OF SAN BERNARDINO

13

14

15   **THE PEOPLE OF THE STATE OF**          Case No.   CIV SB 2317301
     **CALIFORNIA, EX REL. ROB BONTA,**
16   **ATTORNEY GENERAL OF THE STATE**
     **OF CALIFORNIA,**                       **COMPLAINT FOR DECLARATORY**
17                                            **AND INJUNCTIVE RELIEF**

18                                Plaintiff,

19        v.                                  Date:
                                              Time:
20                                            Dept:
     **CHINO VALLEY UNIFIED SCHOOL**          Judge:
21   **DISTRICT,**                            Trial Date:
                                              Action Filed:
22                                Defendant.

23

24        The People of the State of California, by and through Rob Bonta, Attorney General of the

25   State of California, allege on information and belief as follows:

26                                    **INTRODUCTION**

27        1.    The People of the State of California, acting by and through Attorney General Rob

28   Bonta (collectively, the People), seek declaratory and injunctive relief, declaring Board

                                              1

Policy 5020.1's (Policy 5020.1 or Policy) forced disclosure provisions unconstitutional according to the State Constitution and in violation of State law, and enjoining Chino Valley Unified School District from implementing Policy 5020.1's forced disclosure provisions.

2.    Policy 5020.1's forced disclosure provisions include:

    a.  subdivisions 1(a) and 1(b) of the Policy in full;

    b.  subdivision 1(c) of the Policy, insofar as it applies to transgender or gender nonconforming students' requests to change their name, pronouns, sex, or gender on unofficial records; and

    c.  subdivision 5 of the Policy, insofar as it applies to transgender or gender nonconforming students (i) requesting to be treated as a gender other than the student's biological sex or gender listed on the student's birth certificate or any other official records or (ii) accessing sex-segregated school programs or activities that do not align with the student's biological sex or gender listed on the student's birth certificate or any other official records.

3.    Education is a fundamental right in California pursuant to the Equal Protection Clause of the California Constitution, and education is essential to prepare our youth for civic participation and to provide them with the information and judgment needed to maintain a healthy democracy. (Cal. Const., art. IX, § 1.) As California's Constitution recognizes, the "diffusion of knowledge and intelligence [is] essential to the preservation of the rights and liberties of the people . . . ." (Cal. Const., art. IX, § 1.) Formal education also plays an essential role in building understanding of California's diverse communities and the shared values that unite them.

4.    This fundamental right to education is available to all, including those students who are transgender, gender nonconforming, and those whose gender expression and gender identity differ from their cisgender and gender conforming peers.

5.    Under the California Constitution, and pursuant to state law, local educational agencies must ensure that any policies they implement provide equal protection to all students regardless of their gender expression, gender identity, or sexual orientation, and may not

2

1   unlawfully discriminate against any protected class of students while receiving funds from the

2   State. (Cal. Const., art. I, § 7; Ed. Code, § 200 et seq.; Gov. Code, § 11135.)

3        6.      The California Constitution also prohibits local educational agencies from infringing

4   on the privacy rights of their students. (Cal. Const., art I, § 1.)

5        7.      These responsibilities of local educational agencies—to provide equal protection to

6   all students, and to refrain from infringing on the privacy rights of students—must not be taken

7   lightly, and certainly should not be used as justification for discrimination. However, instead of

8   honoring these duties, the Chino Valley Unified School District (District or CVUSD) has singled

9   out an especially vulnerable group of children and youth for discriminatory treatment:

10  transgender and gender nonconforming students.[1]

11       8.      On July 20, 2023, the District School Board adopted Policy 5020.1 and its forced

12  disclosure provisions. The policy mandates that Chino Valley Unified School District employees

13  "out" transgender and gender nonconforming students to their parents or guardians, regardless of

14  the students' wishes, whenever the student asks to be identified or treated as a gender "other than

15  the student's biological sex or gender listed on the student's birth certificate or any other official

16  records."

17       9.      Policy 5020.1 also requires forced disclosure whenever a student requests to use a

18  different name than their legal name or to use pronouns "that do not align with the student's

19  biological sex or gender listed on the student's birth certificate or other official records."

20       10.     And Policy 5020.1 requires staff members to notify parents or guardians whenever

21  the student requests to access "sex-segregated school programs and activities," including asking

22  to join a sports team or use a different bathroom.

23       11.     Since the first day of the 2023-2024 school year, Policy 5020.1 has placed

24  transgender and gender nonconforming students in danger of imminent, irreparable harm from the

25  consequences of forced disclosures. These students are currently under threat of being outed to

26  their parents or guardians against their express wishes and will. They are in real fear that the

27  _____

        [1] As explained below, as used herein, the term "gender nonconforming" includes

28  individuals who are gender nonbinary, i.e., whose gender identity fall outside the traditional male-
    female binary.

                                                3

1  District's policy will force them to make a choice: either "walk back" their constitutionally and

2  statutorily protected rights to gender identity and gender expression, or face the risk of emotional,

3  physical, and psychological harm from non-affirming or unaccepting parents or guardians.

4      12.   Policy 5020.1 unlawfully discriminates against transgender and gender

5  nonconforming students, subjecting them to disparate treatment, harassment, and abuse, mental,

6  emotional, and physical. This is by design: the Board's plain motivations in adopting Policy

7  5020.1 were to create and harbor animosity, discrimination, and prejudice towards these

8  transgender and gender nonconforming students, without any compelling reason to do so.

9      13.   Without action from this Court, transgender and gender nonconforming students'

10  rights to be free from unlawful discrimination, harassment, and abuse will be violated.

11  **JURISDICTION AND VENUE**

12      14.   This Court has jurisdiction over the allegations and subject matter of the People's

13  Complaint filed in this action and the parties to this action pursuant to Government Code

14  section 11180 et seq., and Government Code sections 525, 526, 1060; venue is proper in this

15  County.

16  **PARTIES**

17      15.   The Attorney General is the chief law officer of the State and has the authority to see

18  that the State's laws are uniformly and adequately enforced for the protection of public rights and

19  interests. (Cal. Const., art. V, § 13; Gov. Code, § 11180 et seq.) The Attorney General may file

20  any civil action for the enforcement of California's laws he deems necessary for the protection of

21  public right and interests, absent direct constitutional or legislative restrictions. (See, e.g., *People*

22  *ex rel. Deukmejian v. Brown* (1981) 29 Cal.3d 150, 157.)

23      16.   Defendant Chino Valley Unified School District receives state funds, is a public

24  school district organized and existing under the laws of the State of California, and is responsible

25  for providing public education to District students.

26      17.   Defendant Chino Valley Unified School District is located in San Bernardino County

27  and serves nearly 26,000 students.

28

4

**FACTUAL BACKGROUND**

18.     In California, education is a fundamental interest, and students have the right to equal protection with respect to its provision. (*Serrano v. Priest* (1971) 5 Cal.3d 584, 608-609, 619.) The State of California and the District are required to ensure that all students, regardless of gender, gender identity, and gender expression, are treated equally in all aspects of education. (Cal. Const., art. I, § 7, subd. (a); Ed. Code, §§ 200, 220, 262.4.)

19.     The Attorney General has the authority, in his sole discretion, to bring claims against a school district for violation of the California Constitution, Article 1, section 7, or where the district has violated students' right to be treated equally in all aspects of education, regardless of gender, gender identity, and gender expression. (Ed. Code, §§ 200, 220.)

20.     The Attorney General has the authority, in his sole discretion, to bring claims against a school district that has unlawfully subjected transgender and gender nonconforming students in the district to discrimination while receiving funds from the state. (Gov. Code, § 11135.)

21.     The Attorney General has the authority, in his sole discretion, to bring claims against a school district for violation of the California Constitution, Article I, section 1, where the district has violated the privacy rights of its students.

**A.      Transgender and Gender Nonconforming Students in Unsupportive Environments Experience High Degrees of Discrimination and Harassment**

22.     An individual is transgender if their gender identity differs from the sex the person had or was identified as having at birth. Gender nonconforming individuals include those whose gender identities that are not solely male or female (i.e., gender nonbinary). (Diamond, *Gender Fluidity and Nonbinary Gender Identities Among Children and Adolescents* (2020) 14 Child Development Perspectives 110.)

23.     Gender identity is not a choice, and it is not a mental illness. It is an essential part of one's identity and being, and cannot be voluntarily changed.

24.     Transgender students in unsupportive or unsafe environments suffer significant levels of discrimination, abuse, and harassment, both physical and mental, well above their non-transgender peers.

5

25. Though schools are typically safe and supportive environments, schools that are not can create serious harms for transgender students. A report analyzing 2017-2019 data concerning students across 2,749 California schools—in grades seven, nine, and 11—found that transgender students in California reported negative school experiences and poorer mental health "at higher rates" than any other "sexual orientation subgroups." (Hanson et al., *Understanding the Experiences of LGBTQ Students in California* (Oct. 2019) The California Endowment, pp. 9, 52, https://tinyurl.com/v452ty7s.)

26. A study of 2015-2016 data from California public schools found that more than 40 percent of transgender students reported being bullied because of their gender identity, as opposed to only 7.3 percent of non-transgender students who reported gender-based bullying or bullying on the basis of perceived gender identity. (De Pedro et al., *Exploring Physical, Nonphysical, and Discrimination-Based Victimization Among Transgender Youth in California Public Schools* (2019) 1 Internat. J. of Bullying Prevention 218, 222.)

27. This same study also reported that more than half (55.6 percent) of transgender students in the State reported physical victimization (such as being threatened with a weapon, threatened with harm, shoved, or in a physical fight), and more than two-thirds (69.2 percent) reported nonphysical victimization, such as being called a demeaning name or being the recipient of demeaning sexual jokes or gestures. (De Pedro, *supra,* Internat. J. of Bullying Prevention at p. 222.)

28. Because transgender students face discrimination because of their gender identity, they are also at risk of suicide and serious mental health issues. (James et al., *The Report of the 2015 U.S. Transgender Survey* (Dec. 2016) Nat. Ctr. for Transgender Equality, at p. 132; Kosciw et al., *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* (2020) GLSEN, pp. 52-4; Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and Its Impact on Transgender People's Lives* (2013) J. of Pub. Mgmt. & Soc. Pol'y 65, 76-8)

29. Eighty-six percent of transgender youth reported suicidal thoughts, and 56 percent of transgender youth reported a previous suicide attempt. (Austin et al., *Suicidality Among*

6

1  *Transgender Youth: Elucidating the Role of Interpersonal Risk Factors* (2020) 37 J. Interpersonal

2  Violence 5.)

3      30.    Conversely, transgender children who socially transition[2] have mental health

4  outcomes that mirror those of their cisgender peers. (Coleman et al., *Standards of Care for the*

5  *Health of Transgender and Gender Diverse People, Version 8* (2022) 23 Internat. J. of

6  Transgender Health S1, S77.)

7      31.    A recent study examined the impact of supportive environments (i.e., affirming use of

8  chosen name and pronouns) on depression, suicidal ideation and suicide attempts among

9  transgender youth. Results showed that adding one context (e.g., school, friends) where affirmed

10  gender was used consistently decreased suicidal behavior by 56 percent. (Russell et al., *Chosen*

11  *Name Use Is Linked To Reduced Depressive Symptoms, Suicidal Ideation, And Suicidal Behavior*

12  *Among Transgender Youth*, J. of Adolescent Health (2018) pp. 503-505.)

13      32.    The U.S. Centers for Disease Control and Prevention has found that, "[s]chool

14  connectedness, which is the feeling among adolescents that people at their school care about

15  them, their well-being, and success, has long-lasting protective effects for adolescents. Youth

16  who feel connected at school are less likely to experience risks related to substance use, mental

17  health, violence, and sexual behavior." (Centers for Disease Control, *Youth Risk Behavior Survey:*

18  *Data Summary & Trends Report* (2021) p. 72.)

19      33.    Additionally, while many transgender or gender nonconforming youth are fortunate

20  to have parents or guardians who are accepting of their gender identity, others are not so lucky.

21  Those who do not have parents or guardians who accept or affirm their gender identity risk

22  physical, mental, and emotional harm and abuse if their parents, guardians, or other relatives learn

23  of their identity.

24      34.    In the 2015 U.S. Transgender Survey, 10 percent of respondents said that an

25  immediate family member had been violent toward them because they were transgender, and 15

26  [2] Social transition is the process by which transgender people publicly affirm their gender identity

27  after coming out. This commonly involves changing one's name and pronouns, as well as dress and other external gender cues such as voice and mannerisms. (Olson et al., *Gender Identity 5*

28  *Years After Social Transition* (2022) 150 Pediatrics 2.) That study found that 94 percent of transgender youth maintain their gender identity five years after social transition.

7

1  percent ran away from home or were kicked out of their home because they were transgender.

2  (James et al., *supra*, Nat. Ctr. for Transgender Equality at p. 65.) Of those who transitioned in the

3  year preceding the survey, eight percent reported violence from an immediate family member

4  because they were transgender, seven percent ran away from home, and eight percent had been

5  kicked out of their home. (*Id.* at pp. 71-72, 74.)

6      35.    Fewer than one-in-three transgender and gender nonbinary youth found their home to

7  be gender-affirming, or accepting of their gender identity. (The Trevor Project, 2022 National

8  Survey on LGBTQ Youth Mental Health, p. 4, https://tinyurl.com/2fn5xfjr.)

9      36.    Due to these risks, many transgender and gender nonconforming students are not

10  "out" to their immediate families.

11      37.    Recognizing these risks, the California Department of Education has issued statewide

12  guidance since at least 2014, generally recommending that school officials and staff members not

13  "out" students to their parents or guardians against the students' wishes. (Cal. Dept. of Ed.,

14  Frequently Asked Questions, https://www.cde.ca.gov/re/di/eo/faqs.asp.) Doing so, the guidance

15  notes, could "compromise the student's safety" by "increasing the student's vulnerability to

16  harassment," violence, or other forms of abuse at school or at home. (*Ibid.*)

17      38.    Many California districts, including Chino Valley Unified, have incorporated this

18  guidance into binding Administrative Regulations; CVUSD's had been in place for years before

19  the adoption of Policy 5020.1.

20      39.    California's Education Code also requires schools to permit students "to participate in

21  sex-segregated school programs and activities, including athletic teams and competitions, and use

22  facilities consistent with" their "gender identity, irrespective of the gender listed on the pupil's

23  records." (Ed. Code, § 221.5, subd. (f).)

24  **B.    The Chino Valley Unified District School Board Adopts Policy 5020.1 and**

25  **Demonstrates Its Animus**

26      40.    On July 20, 2023, the District School Board, which has five members, held a public

27  meeting to discuss whether to adopt Policy 5020.1, requiring, in relevant part, school personnel to

28

8

1  "out" transgender and gender nonconforming students to their parents or guardians without their

2  consent and even against their express wishes.

3      41.    Over several hours, more than 80 members of the public spoke regarding the forced

4  disclosure policy.

5      42.    Those opposing the policy included current and former LGBTQ+ and cisgender

6  students, and teachers, parents, mental health professionals, and advocates who warned that the

7  policy would endanger transgender and gender nonconforming students.

8      43.    A current CVUSD transgender student stated, "[t]his policy threatens my safety" and

9  "tells me I don't belong." The student explained: "52 percent of trans kids feel accepted at school,

10  but only 35 percent feel accepted at home. That leaves a large gap there of kids who feel welcome

11  at school but not at home. Feeling safe at school lessens suicide risk. If a student isn't out to their

12  parent, [Policy 5020.1] shoves them 'in the closet' at school. That's a miserable place to be."

13      44.    Another LGBTQ+ and current CVUSD student added, "[t]his policy will destroy the

14  lives of kids who should not have to live in fear for being their true selves."

15      45.    A third CVUSD student, who self-identified as LGBTQ+, noted that "LGBTQ youth

16  who experience parental rejection are eight times more likely to attempt suicide and six times

17  more likely to report major depressive symptoms."

18      46.    Explaining the consequences of forced disclosure, a recent graduate from a CVUSD

19  high school, who also self-identified as LGBTQ+, stated that "[Students] could be kicked out or

20  attacked by their parents both physically and verbally. Their home life may become a living hell

21  because of that [disclosure]."

22      47.    Several adults read letters to the Board by Chino Valley LGBTQ+ students or

23  individuals who feared for their safety.

24      48.    One read a letter from a transgender student that explained: "If a student is outed to

25  their family without their consent, this could possibly result in abuse, hate crimes, getting kicked

26  out of their homes, [and] in extreme cases, being murdered."

27

28

Complaint for Declaratory and Injunctive Relief

49.   Another letter from a transgender student raised "the continuous fear and pressure that [the Policy ] put[s] upon all of us trans youth. . . . we're constantly in a state of panic, fearing the consequences of being outed. Some of us may even feel the need to hide our identities."

50.   Parents of current CVUSD students expressed similar opposition to Policy 5020.1's forced disclosure provisions. One parent, who was also a "public school educator with 22 years of experience," identified the Policy as "a flagrant attempt to isolate, shame, and otherwise alienate our LGBTQIA students, creating a hostile environment for them in our public schools."

51.   Another parent and former educator stated, "[t]his policy breaks down trust between parents, teachers, and students and exposes our most vulnerable students. Policies like this . . . make all kids feel less safe. Kids cannot learn if they do not feel safe, period."

52.   One former educator "know[s] students who left the district because they were outed," cautioning that "[t]hey will be put in . . . risky situations; they will be unhoused; they will have . . . suicidal tendencies if this policy is passed."

53.   Also speaking in opposition to the Policy's forced disclosure provisions, a school counselor on the board of directors of the National Association of Social Workers' California Chapter warned that Policy 5020.1 "directly contradicts" social workers' "oath to do no harm in our work with students," including social workers' commitment to "put our students' safety and trust first."

54.   Sounding similar notes, another individual speaking in opposition referenced research showing that "if parent notification was mandated," youth are "less likely to seek . . . counseling or medical services."

55.   One CVUSD teacher put it starkly: "This policy will out a student . . . putting them into a hostile household, which will further their mental degradation to the point where they will harm themselves. . . . This policy will kill somebody."

56.   State Superintendent of Public Instruction Tony Thurmond also attended the hearing, speaking in opposition. Superintendent Thurmond pointed out that the policy "not only may fall outside of the laws that respect privacy and safety for our students but may put our students at risk because they may not be in homes where they can be safe."

10

57.   Individuals who spoke in support of Policy 5020.1's forced disclosure requirements claimed that transgender identity is a "mental illness," a "delusion," and a "damaging ideolog[y]."

58.   Echoing these statements before voting to enact the policy, Board members described students who are transgender or gender nonconforming as suffering from a mental illness or perversion, or as being a threat to the integrity of the nation and the family.

59.   Board Member 1, for example, stated, "there's always been man, woman; and then you have this transgender [identity] . . . it is an illusion; it is mental illness." He noted that "at the end, our children are going to be lonely, isolated, and in despair. And a lot of them are not going to be having children because it's one way to reduce the population, realistically."

60.   Board Member 1 further likened the issues related to gender identity to a "death culture," and claimed that that the Policy was needed because "women are being erased," and that "[i]t's not going to end with transgenderism. . . . You got to put a stop to it."

61.   The Board President expressed "appreciat[ion]" for "each one of our board member's viewpoints," offering no repudiation of Board Member 1's comments about transgender identity.

62.   Additionally, the Board President stated that transgender and gender nonconforming individuals needed "non-affirming" parental actions so that they could "get better."

63.   In an earlier part of the Board meeting, the Board President claimed that the State Superintendent—who had cautioned that the policy may endanger transgender or gender nonconforming youth—was "proposing things that pervert children."[3]

64.   In his comments supporting the Policy, Board Member 2 stated that it was needed to counter Karl Marx's call, in the *Communist Manifesto*, "for the abolition of the family" and prevent the creation of "the, quote and unquote, 'new man.'"

65.   At the conclusion of its meeting, the Board voted 4-1 to approve Policy 5020.1. The Board President and Board Members 1, 2, and 3 voted in support.

66.   Board Member 4, the lone dissenter, expressed concern that "[i]f this policy passes, we will have, effectively, shut the door on students confiding to a staff member or a teacher," preventing the school from being "a supportive place." Board Member 4 continued: "So how

---

[3] *Id.*, p. 75:1-6.

11

1  good is this notification process if these students are, effectively . . . 'throw[n] . . . back into the

2  closet . . . slamming the door?'"

3  **C.    The Policy Singles Out Transgender and Gender Nonconforming Students**

4  **for Discriminatory Treatment**

5          67.     The Policy states that a school's "[p]rincipal/designee, certificated staff, and school

6  counselors" shall notify parents or guardians "in writing, within three days" whenever "any

7  District employee, administrator, or certificated staff, becomes aware" that a student is:

8          (a) Requesting to be identified or treated, as a gender (as defined in Education Code
           Section 210.7) other than the student's biological sex or gender listed on the student's
9          birth certificate or any other official records. This includes any request by the student
           to use a name that differs from their legal name (other than a commonly recognized
10         diminutive of the child's legal name) or to use pronouns that do not align with the
           student's biological sex or gender listed on the student's birth certificate or other
11         official records.

12         (b) Accessing sex-segregated school programs and activities, including athletic teams
           and competitions, or using bathroom or changing facilities that do not align with the
13         student's biological sex or gender listed on the birth certificate or other official
           records.
14
           (c) Requesting to change any information contained in the student's official or
15         unofficial records.

16  (Policy 5020.1, § 1, subds. (a)-(c).)[4]

17          68.     Policy 5020.1 also requires school personnel to log and officially document the

18  forced outing of a transgender or gender nonconforming student: "The District employees who

19  make such notification shall either keep a record of such notification (if written) or document

20  such notification (if verbal) and place the record or documentation in the student's official student

21  information system." (*Id.*, § 5.)

22          69.     Finally, Policy 5020.1 contains the following paragraph:

23         For purposes of this Board policy, Family Code Section 6924, Health and Safety
           Code Section 124260, and Education Code Section 49602(C), inclusion of
24         parent(s)/guardian(s) is appropriate unless specifically prohibited by law. Nothing in
           this policy affects the obligations of the District's employees, administrators, and
25         certificated staff as mandated reporters under Article 2.5 of the Child Abuse and
           Neglect Reporting Act Sections 11164-11174.3 of the Penal Code, and the District
26         Policy 5141 and Administrative Regulations 5141.4(a)).

27  _____
    [4] Policy 5020.1 also has provisions relating to disclosures, for instance, related to complaints of
28  bullying involving a child. (*Id.*, § 4.) As noted above, this litigation challenges the Policy's
    provisions on forced disclosure of gender identity.

12

1   (*Id.*, § 6.)

2   70.    As to this paragraph, at the Board Meeting, counsel for the District stated that Policy

3   5020.1 was limited in application based on "very specific statutes" governing school counselors

4   and the disclosure of confidential information, although he did not reference these citations

5   specifically. Counsel claimed that if a student aged 12 years or older stated to a school counselor

6   "while receiving counseling services" that they wished to use different bathroom facilities or told

7   the counselor they were "transgender, gender nonconforming, binary, . . . whatever it is that is

8   their gender identity," the counselor would be prohibited from disclosing this information based

9   on privacy.

10   71.    Counsel's characterizations were incorrect, as these statutory provisions do not limit

11   forced disclosure of a student's gender identity at all, or only limit such forced disclosure in

12   narrow circumstances.

13   72.    Family Code Section 6924, subdivision (d), directs counselors and mental health

14   providers providing treatment to minors 12 years and older to include "the minor's parent or

15   guardian" in the treatment of the minor "unless, in the opinion of the professional person who is

16   treating or counseling the minor, the involvement would be inappropriate." Health and Safety

17   Code Section 124260, subdivision (c) contains a nearly identical provision for students 12 years

18   and older, except that it also requires the professional person to consult with a minor before

19   determining that parental involvement is inappropriate.

20   73.    Thus, rather than providing *prohibitions* on disclosure, these sections only *permit*

21   non-disclosure if the counselor concludes disclosure would be appropriate.

22   74.    Education Code section 49602 states that personal information disclosed by a student

23   "in the process of receiving counseling from a school counselor . . . is confidential." However,

24   Education Code section 49602, subdivision (c)—the subdivision cited in Policy 5020.1—*permits*

25   counselors to "[r]eport[] information to the principal or parents of the pupil when the school

26   counselor has reasonable cause to believe that disclosure is necessary to avert a clear and present

27   danger to the health, safety, or welfare of the pupil" or "other school community members."

28

13

75.     Article 2.5 of the Child Abuse and Neglect Reporting Act (CANRA) simply requires school personnel to report known or suspected child abuse to a Child Welfare Agency or a police department; it does not require a school staff member to withhold a student's transgender identity, even if the staff member knows that disclosure could cause harm to the student.

76.     Finally, Policy 5020.1 states that "[n]othing in this policy affects the obligations of the District's employees . . . under . . . District Policy 5141 and Administrative Regulation[] 5141.4(a)." But neither address student privacy or otherwise create an exemption to Policy 5020.1's forced disclosure rule.

77.     Chino Valley Administrative Regulation 5141.4(a) simply reiterates school personnel's mandatory reporting obligations under CANRA. And Policy 5141 enumerates steps schools will take to provide "first aid and/or medical attention" in an emergency, noting that "parents/guardians are notified as appropriate" whenever an accident or injury occurs.

**D.      The Attorney General's Investigation of Policy 5020.1**

78.     On August 4, 2023, the Department of Justice (DOJ) began an investigation to determine the legality and effect of Policy 5020.1's forced disclosure provisions pursuant to Government Code section 11180 et seq. The District was notified of the opening of the investigation that same day.

79.     Under Government Code section 11181, subdivision (h), the DOJ may "[p]resent information or evidence obtained or developed from the investigation of unlawful activity to a court . . . in connection with any action or proceeding."

80.     During the investigation, the DOJ interviewed or communicated with current District counsel, the District Superintendent, students, parents, teachers, and community members regarding Policy 5020.1 and its effects, and received documents responsive to subpoenas.

81.     DOJ learned that counsel for the District provided a training and PowerPoint presentation to school administrators across the District on July 19, 2023. In that training, counsel referenced California's right to privacy (Cal. Const., art. I, § 1), the right to safe schools (Cal. Const., art I, § 28, subd. (f)), Education Code section 49602, and Penal Code section 11165.7 as

14

1    "legal issues with respect to parental notification." Counsel also acknowledged the

2    recommendations provided in the California Department of Education's statewide guidance.

3        82.    At that training, district Superintendent Dr. Norm Enfield told administrators that

4    there were no other trainings planned, but that administrators were to train school staff about

5    Policy 5020.1 in staff training immediately prior to the first day of school on August 7, 2023.

6        83.    On August 4, 2023, teachers in at least one school in the District attended training

7    from a school administrator regarding the District's Policy 5020.1.

8        84.    In an August 4 training at one school, a principal informed teachers that after the

9    school disclosed the student's gender identity to the student's parents or guardians, the school

10   principal would arrange a meeting between the principal, the student, and the student's parents or

11   guardians. The principal also told teachers that the principal would "call the child out of class,"

12   inform the student of "what was going to happen," and attempt to persuade the student to "walk it

13   back"—i.e., to disclaim their gender identity—before the meeting.

14       85.    When a teacher asked for clarification in that training about when a "name" change

15   would trigger the forced disclosure, the principal stated that the forced disclosure would occur

16   only if the teacher received a request for a name change that the teacher believed was "gender

17   connected."

18       86.    During that training, the principal informed teachers that if they did not report a

19   student's name, gender, or bathroom request to the school administration, it will be "an HR

20   issue."

21       87.    The principal also told teachers not to bring up the policy in their classrooms to avoid

22   students getting "fired up," warning that if teachers did raise it with students, the teachers would

23   find themselves in an "awkward, uncomfortable position."

24       88.    Several teachers in the District have also informed DOJ that school personnel have

25   already disclosed several students' gender identities to their parents or guardians without the

26   students' consent, and have observed that these students have experienced emotional, physical, or

27   mental harm following the forced disclosure.

28

15

89. One teacher reported that one of his students was outed, against her wishes, within the first two days of schools, leaving her in tears.

90. Multiple teachers have described how Policy 5020.1's forced disclosure provisions have created an environment of fear that has substantially harmed their students.

91. One teacher shared that, since the enactment of Policy 5020.1, LGBTQ+ students are having hushed conversations about "which teacher is safe" and "which teacher might report them."

92. A second teacher observed "significant change" in students at his high school. As the faculty liaison for the student-run LGBTQ+ club, this teacher had in previous years seen students expressing their gender identity and other parts of their personality "openly," with "enthusiasm," "energy and excitement." After Policy 5020.1, students are "withdrawn" and "no longer . . . speaking up" about "LGBTQ+ rights."

93. One student, Jordan,[5] informed a teacher that, following the enactment of Policy 5020.1, "I feel like I'm not wanted." He expressed fear that his teacher will be forced to out him to his parents, as Jordan had a parent hostile toward the LGBTQ+ community who had "an aggressive personality"; Jordan "did not feel safe" if his gender identity was disclosed.

94. A former educator and parent of current students in the District spoke numerous times with Morgan, a current District student who expressed fear of severe physical or emotional harm that Policy 5020.1 would cause him.

95. Morgan had participated in his school's "Gender Support Plan"—which provided accommodations for his gender identity at school—but became fearful enough that he asked the former educator whether he should delete their support plan and all the accommodations included to avoid the even greater harm that would be caused by forced disclosure.

96. Chris, a current student in the District who prefers they/them pronouns, confirmed the harms that students experienced when they (the students) felt unsafe and unable to openly share their gender identity with faculty. Chris noted that when a teacher refused to recognize their (Chris's) gender identity, it caused them to withdraw completely from participating at all in class.

---

[5] Students are referred to by pseudonyms herein to protect their privacy and safety.

16

97.     Chris was in attendance at the District's July 20 Board meeting, and when they heard the comments made by Board members, after several queer or transgender students had made their presence known during public comment—comments calling transgender identity a "delusion" or "mental illness"—Chris felt that the Board member "was speaking to us, the trans kids in the audience. . . . like he wanted us to know that we were an illness that needed to be cured. That we needed to be exterminated."

98.     The Board's policy and its statements made Chris feel physically threatened.

99.     Another transgender student in the District informed Chris that though this student usually asks teachers to call them by a gender-affirming nickname, the student was too afraid to do so this year due to the policy, and was "struggling with depression and anxiety."

100.    Chris affirmed how "extremely draining" it was to hide their identity. Chris stated, "No kid wants to have to waste time that could be spent finishing their homework to attend a Board meeting to fight for their right to exist. . . . We don't deserve to be shoved back in the closet, forever afraid to express who we are."

101.    The Rainbow Youth Project, an LGBTQ+ organization working in Chino Valley, established a crisis hotline to collect reports related to the enactment of Policy 5020.1. Between August 5 and 23, 2023, the Rainbow Youth Project's case management and crisis teams answered 61 communications specifically from San Bernardino County, as reported by the individual callers utilizing the hotline number designed for reports regarding Policy 5020.1.

102.    Of the communications about Policy 5020.1's forced disclosure provisions to Rainbow Youth Project: 58 contacts reported a desire to relocate to a different school district; 54 contacts sought resources regarding rights and procedures under federal antidiscrimination law; 26 contacts screened positive for anxiety; 17 contacts screened positive for isolation; and one contact expressed thoughts of self-harm and/or suicidal ideation that pre-dated the adoption of Policy 5020.1 but were exacerbated by the adoption of Policy 5020.1. The individual expressing thoughts of self-harm was referred to mental health counseling.

1    103.  Our Schools USA, another organization working in Chino Valley, has informed DOJ

2    of additional reports of current students who have experienced harm or who reasonably fear harm

3    as a result of Policy 5020.1's forced disclosures.

4    104.  During its investigation, counsel for the District represented that the District was in

5    the process of drafting an Administrative Regulation related to Policy 5020.1, to be presented for

6    consideration at the Board's September 7, 2023 meeting.

7    105.  On August 14, 2023, the Attorney General served a letter on the District requesting

8    the District halt implementation or enforcement of Policy 5020.1 until after the District adopted

9    and promulgated Administrative Regulations related to Policy 5020.1.

10   106.  On August 18, 2023, counsel for the District stated that the District rejected the

11   Department of Justice's request.

12   107.  On August 18, the District provided a production of records that included a draft

13   Administrative Regulation 5020.1. The draft Administrative Regulation reiterates the forced

14   disclosure provision of Policy 5020.1 and adds that following a forced disclosure, the principal or

15   other individual will contact the Coordinator of Equity, Diversity, and Support system to facilitate

16   a student plan.

17   108.  Investigating the District's policy, to date, the DOJ has found that Policy 5020.1 has

18   already resulted in forced disclosures of students' gender identity during the first two weeks of

19   school, causing harm, and that the Policy imminently threatens further severe, irreparable

20   physical, emotional, and psychological harm to students.

21   **CAUSES OF ACTION**

22   **FIRST CAUSE OF ACTION**

23   **(Violation of California Constitution, Article I, section 7)**

24   109.  Plaintiff realleges all paragraphs set forth above and incorporates them by reference

25   as though they were fully set forth in this cause of action.

26   110.  Under the California Constitution, Article I, section 7, sex is a suspect classification.

27   (See *Catholic Charities of Sacramento, Inc. v. Super. Ct.* (2004) 32 Cal.4th 527, 564; *Sail'er Inn,*

28   *Inc. v. Kirby* (1971) 5 Cal.3d 1, 17-20.) So too is sexual orientation: gay and lesbian people

18

1    constitute a protected class for equal protection purposes, because—like racial minorities and

2    women—they have been subject to invidious treatment unrelated to their ability to contribute to

3    society. (*In re Marriage Cases* (2008) 43 Cal.4th 757, 843-844.) It follows that gender identity is

4    a suspect classification as well.

5        111.  Following an investigation carried out pursuant to his authority as the state's chief

6    law officer and pursuant to Government Code section 11180 et seq., the Attorney General has

7    determined that Defendant has violated the California Constitution, Article 1, section 7, by

8    subjecting transgender and gender nonconforming students in the District to expressly

9    discriminatory treatment, through passage and implementation of Policy's 5020.1's forced

10   disclosure provisions.

11       112.  The District's passage and implementation of Policy 5020.1's forced disclosure

12   provisions violate the California Constitution, Article 1, section 7, by subjecting transgender and

13   gender nonconforming students in the District to expressly discriminatory treatment.

14       113.  The District has no compelling interest for singling out transgender and gender

15   nonconforming students to different and unfavorable treatment, and the forced disclosure

16   provisions are neither necessary nor narrowly tailored.

17       114.  Due to Defendant's violations of the California Constitution, declaratory and

18   injunctive relief is an appropriate remedy.

19                            **SECOND CAUSE OF ACTION**

20                    **(Violation of Education Code sections 200 et seq.)**

21       115.  Plaintiff realleges all paragraphs set forth above and incorporates them by reference

22   as though they were fully set forth in this cause of action.

23       116.  Education Code section 200 states, in pertinent part, that "[i]t is the policy of the State

24   of California to afford all persons in public schools, regardless of their . . . gender, gender

25   identity, [or] gender expression . . . equal rights, and opportunities in the educational institutions

26   of the state." It adds that "[t]he purpose of this chapter is to prohibit acts that are contrary to that

27   policy and to provide remedies therefor."

28

117.  Education Code section 220 implements that policy by prohibiting discrimination based on gender, gender identity, and gender expression in state-funded programs and activities: "No person shall be subjected to discrimination on the basis of . . . gender, gender identity, [or] gender expression . . . in any program or activity conducted by an educational institution that receives, or benefits from, state financial assistance, or enrolls pupils who receive state student financial aid."

118.  Following an investigation carried out pursuant to his authority as the State's chief law officer and Government Code section 11180 et seq., the Attorney General has determined that Defendant receives state funding and has violated Education Code section 200 et seq. by subjecting transgender and gender nonconforming students to discrimination.

119.  Defendant's Policy 5020.1's forced disclosure provisions discriminate against transgender and gender nonconforming students on the basis of their gender identity and expression by singling them out for unfavorable treatment.

120.  Due to Defendant's violations of Education Code sections 200 et seq., and their implementing regulations, declaratory and injunctive relief is an appropriate remedy.

### THIRD CAUSE OF ACTION

### (Violation of Government Code section 11135)

121.  Plaintiff realleges all paragraphs set forth above and incorporates them by reference as though they were fully set forth in this cause of action.

122.  Government Code section 11135 prohibits discrimination based on sexual orientation or sex—which is defined to include gender and gender expression—in state-funded programs and activities, including prohibiting unlawful denial of full and equal access to the benefits of and unlawful discrimination under any such program or activity receiving funding or financial assistance from the State.

123.  Following an investigation carried out pursuant to his authority as the State's chief law officer, the Attorney General has determined that Defendant has violated Government Code section 11135 by unlawfully subjecting transgender and gender nonconforming students in the District to discrimination while receiving funds from the State.

20

1    124.  Defendant's Policy 5020.1's forced disclosure provisions violate Government Code

2    section 11135 because they unlawfully subject transgender and gender nonconforming students in

3    the District to discrimination while receiving funds from the State.

4    125.  Due to Defendant's violations of Government Code section 11135, declaratory and

5    injunctive relief is an appropriate remedy.

6                                    **FOURTH CAUSE OF ACTION**

7                    **(Violation of California Constitution, Article I, section 1)**

8    126.  Plaintiff realleges all paragraphs set forth above and incorporates them by reference

9    as though they were fully set forth in this cause of action.

10    127.  Following an investigation carried out pursuant to his authority as the State's chief

11    law officer, the Attorney General has determined that Defendant has violated the California

12    Constitution, Article 1, section 1, by infringing on the privacy interests of transgender and gender

13    nonconforming students, without the compelling interest necessary to overcome the privacy

14    interests of those students, and because there are feasible and effective alternatives which have a

15    lesser intrusion upon students' autonomy.

16    128.  Defendant's Policy 5020.1's forced disclosure provisions violate the California

17    Constitution, Article 1, section 1, by infringing on the privacy interests of its transgender and

18    gender nonconforming students, without the compelling interest necessary to overcome the

19    privacy interests of those students, and because there are feasible and effective alternatives which

20    have a lesser intrusion upon students' autonomy.

21    129.  Due to Defendant's violations of the California Constitution, declaratory and

22    injunctive relief is an appropriate remedy.

23                                    **PRAYER FOR RELIEF**

24    WHEREFORE, Plaintiff respectfully prays for the Court to enter judgment as follows:

25    130.  Issue a declaration that Policy 5020.1's forced disclosure provisions are

26    unconstitutional under the California Constitution and/or violates State law;

27    131.  Issue a temporary restraining order and preliminary injunction prohibiting Defendant,

28    until the resolution of this case, from implementing the following provisions of Policy 5020.1:

21

   a.   subdivisions 1(a) and 1(b) of the Policy in full;

   b.   subdivision 1(c) of the Policy, insofar as it applies to transgender or gender nonconforming students' requests to change their name, pronouns, sex, or gender on unofficial records; and

   c.   subdivision 5 of the Policy, insofar as it applies to transgender or gender nonconforming students (i) requesting to be treated as a gender other than the student's biological sex or gender listed on the student's birth certificate or any other official records or (ii) accessing sex-segregated school programs or activities that do not align with the student's biological sex or gender listed on the student's birth certificate or any other official records;

132.  Issue an order permanently enjoining Defendant from implementing the following provisions of Policy 5020.1:

   a.   subdivisions 1(a) and 1(b) of the Policy in full;

   b.   subdivision 1(c) of the Policy, insofar as it applies to transgender or gender nonconforming students' requests to change their name, pronouns, sex, or gender on unofficial records; and

   c.   subdivision 5 of the Policy, insofar as it applies to transgender or gender nonconforming students (i) requesting to be treated as a gender other than the student's biological sex or gender listed on the student's birth certificate or any other official records or (ii) accessing sex-segregated school programs or activities that do not align with the student's biological sex or gender listed on the student's birth certificate or any other official records;

133.  Issue an order entering final judgment;

134.  Award reasonable attorneys' fees and costs of suit as permitted by law; and

For such other and further relief as the Court deems just and proper.

22

1  Dated: August 28, 2023

Respectfully submitted,

ROB BONTA
Attorney General of CaliforniaMICHAEL L.
NEWMAN
Senior Assistant Attorney General
LAURA L. FAER
JAMES F. ZAHRADKA II
Supervising Deputy Attorneys General
EDWARD NUGENT
GARY D. ROWE
ALEXANDER SIMPSON
XIYUN YANG
Deputy Attorneys General

*Delbert Tran*

DELBERT TRAN
Deputy Attorney General

23



**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF SAN BERNARDINO**
San Bernardino District
247 West 3rd St
San Bernardino, CA 92415
www.sb-court.org

# PORTAL MINUTE ORDER

Case Number: CIVSB2317301                                          Date: 9/6/2023

Case Title:   The People of the State of California, Ex Rel. et al
              -v-
              Chino Valley Unified School District

| Department S27 - SBJC | Date: 9/6/2023 | Time: 8:30 AM | Ex Parte Hearing - Predisposition |
|---|---|---|---|

Judicial Officer: Thomas S Garza
Judicial Assistant: Debra Pedrosa
Court Reporter: Charlona Quidor
Court Attendant: Cesar Lepe

**Appearances**
Attorney Alexander Simpson, Attorney James F Zahradka II, Attorney Delbert K Tran present for Plaintiff Rob Bonta,
The People of the State of California, Ex Rel.
Attorney Anthony P De Marco, Attorney William A Diedrich present for Defendant Chino Valley Unified School District

**Proceedings**
Stip and appointment of pro tem reporter filed
The People of the State of California, Ex Rel.'s Ex parte Application for temporary restraining order is heard.

Court finds notice of the hearing on ex parte application was given to the opposing party.
Ex parte application argued.

**Court Finds:**
The People of the State of California, Ex Rel.'s Ex parte Application for temporary restraining order is granted.
Findings stated on the record by the Court.

Order Filed Re: granting TRO; granting application to seal

**Hearings**
Order to Show Cause - Predisposition set for 10/13/2023 at 8:30 AM in Department S27 - SBJC
Preliminary Injunction

9:41 AM

== Minute Order Complete ==